[Cite as *State v. Brown*, 2017-Ohio-7424.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27312 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-15 |
| | : | |
| ROBERT E. BROWN, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of September, 2017.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

KRISTIN ARNOLD, Atty. Reg. No. 0088794, 120 West Second Street, Suite 1502, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Robert E. Brown, Jr., appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of one count of felonious assault. In support of his appeal, Brown contends that his trial counsel was ineffective in failing to request a jury instruction on self-defense. For the reasons outlined below, we agree with Brown's claim. Accordingly, the judgment of the trial court will be reversed and remanded for further proceedings.

### Facts and Course of Proceedings

{¶ 2} On March 15, 2016, the Montgomery County Grand Jury returned an indictment charging Brown with one count of felonious assault (serious harm) in violation of R.C. 2903.11(A)(1), a second-degree felony. The charge arose from allegations that on November 23, 2015, Brown beat and seriously injured DeShon Randolph while Randolph was visiting Brown's girlfriend, Alicia Crutchfield, at her apartment. Brown pled not guilty to the charge and the case proceeded to a jury trial.

{¶ 3} At trial, the State presented testimony from both Crutchfield and Randolph. Crutchfield testified that Brown was her boyfriend at the time of the altercation and that they had been dating for about five or six months. Although Crutchfield denied living with Brown, she testified that Brown had a set of keys to her apartment and that he often spent the night with her.

{¶ 4} Randolph, a married man, lived four doors down from Crutchfield's apartment. Both Randolph and Crutchfield testified to being friends, but denied having a romantic relationship with one another. Randolph testified that prior to the altercation

in question, he had never seen Brown at Crutchfield's apartment and that he did not know Crutchfield had a boyfriend.

{¶ 5} With regards to the November 23, 2015 altercation, Crutchfield and Randolph testified that Crutchfield called Randolph that evening and asked if he wanted to come over to her apartment for some drinks. Following the invitation, Randolph walked over to Crutchfield's apartment and had two shots of liquor while he and Crutchfield were upstairs in her bedroom talking and listening to music. Both Crutchfield and Randolph claimed that Crutchfield's four children were in the apartment while Randolph was visiting and that nothing sexual was going on between them.

{¶ 6} After spending an hour and a half at Crutchfield's apartment, Randolph testified that he went to use the second floor bathroom, which is located next to Crutchfield's bedroom and in front of the stairway that leads down to the front door of Crutchfield's apartment. When he exited the bathroom and started going down the stairs, Randolph recalled someone hitting him on the left side of his jaw. Randolph testified that he almost fell down the stairs after being hit, but caught himself on the wall. According to Randolph, the same individual continued to hit him on the left side of his head near his eye, which caused him to tumble down the stairway and hit the front door. Randolph testified that he was able to catch a glimpse of his attacker, but did not recognize him.

{¶ 7} Following his fall down the stairs, Randolph testified that his head and knees were hurting and that he could not walk. Randolph claimed that he crawled to the living room because the front door of Crutchfield's apartment was locked. Randolph claimed the same individual then approached him in the living room and hit him two more times,

once in the mouth and once near his left eye. Randolph did not recall the attacker ever striking him in the legs.

{¶ 8} After describing the attack, Randolph testified that he left Crutchfield's apartment by crawling out the back door. He claimed that someone helped him to his apartment where he briefly discussed the attack with Officer Jamie Luckoski of the Dayton Police Department. The following day, the Dayton Police Department contacted Randolph and showed him a photospread of possible suspects. When shown the photospread, Randolph identified Brown as his attacker with 75 percent certainty. Randolph also identified Brown as his attacker at trial.

{¶ 9} Continuing, Randolph testified that he went to Miami Valley Hospital for treatment after the attack. Randolph was treated for a fractured kneecap and facial injuries including a left orbital blow-out fracture (broken bones beneath the eyeball) and a cheekbone fracture. Randolph's attending physician, Dr. Derek Broering, appeared at trial and testified regarding the severity of Randolph's injuries. According to Broering, Randolph's kneecap was broken in half. Broering testified that this was a significant injury, as it disrupted the function of Brown's leg and required surgery. Broering testified that the facial fractures were considered mild and did not require surgery. On cross-examination, Dr. Broering indicated that he was unable to tell whether the left orbital blow-out fracture was a new or old fracture at the time he examined Randolph.

{¶ 10} Crutchfield also testified regarding the altercation. Crutchfield testified that she was in her bedroom when she initially saw Brown standing at the top of the stairway. She claimed that she asked Brown "how you doing?" and then observed a look in his eyes as if something was wrong. Trial Trans., Vol. II (Sept. 14, 2016), p. 223.

Crutchfield claimed that Brown then handed her 15-year-old son a pizza he was carrying and told him to go downstairs and feed his brothers and sisters. After that, Crutchfield claimed that Brown started to punch Randolph at the top of the stairway and accuse him of having sex with her. According to Crutchfield, Brown initiated the altercation and Randolph "never had a chance to defend himself." *Id.* at 248.

{¶ 11} Crutchfield also testified that she began screaming for Brown to stop hitting Randolph and tried to explain that she "never touched him." *Id.* at 227. However, Crutchfield claimed that Brown "went blank" and continued punching Randolph. *Id.* at 227-228. Crutchfield further testified that Brown began to choke her when she attempted to leave her bedroom. When Brown let her go, Crutchfield fled her apartment for a friend's house because she feared Brown was going to hit her.

{¶ 12} When Crutchfield returned to her apartment, she spoke with Officer Luckoski who questioned her regarding the altercation. Initially, Crutchfield reported that she saw no altercation and did not mention the choking incident. Crutchfield claimed that she did not report what she saw because she was afraid of Brown and was under the influence of alcohol. However, Crutchfield claimed that she eventually provided officers with a picture of Brown from her cell phone and provided the State with her observations of the altercation.

{¶ 13} After the State rested its case, Brown testified in his defense and provided an entirely different version of events. Brown claimed that he lived with Crutchfield and that on the night in question he came home from work to find Crutchfield and Randolph upstairs in her bedroom standing face to face. According to Brown, Randolph was not wearing a shirt and Crutchfield was in her pajamas. Brown testified that when Crutchfield

saw him staring at her and Randolph, she cursed and ran down the stairs. Brown claimed that he followed Crutchfield to ask her what was going on, but she fled the apartment in the direction of her best friend's house.

{¶ 14} Thereafter, Brown realized that Randolph was still upstairs where Crutchfield's children were sleeping. As a result, Brown decided to go back upstairs to check on the children and to tell Randolph to leave the apartment. Brown testified that he had no intent to physically fight Randolph. However, Brown claims that when he reached the top of the stairway, Randolph tackled him, causing him to fall backwards until he caught himself on the handrail. Brown testified that he was confused and afraid when Randolph tackled him. Brown thought Randolph was trying to hurt him, so he began hitting Randolph. Brown claims that Randolph fell down the stairway while they were tussling and swinging at each other, and that he kept himself from falling by grabbing the handrail.

{¶ 15} After Randolph fell down the stairs, Brown claimed that he went to check on Crutchfield's children. Once he confirmed the children were okay, Brown went downstairs and observed Randolph leaning against a wall in the threshold of the kitchen and living room. At that point, Brown noticed Randolph was "wobbly" and "hobbling." Trial Trans., Vol. II (Sept. 14, 2016), p. 270. Brown testified that he did not continue to fight Randolph because Randolph was defenseless. Instead, Brown cussed at Randolph and told him to "get the hell out of the house." *Id.* at 269-270. Thereafter, Brown left the apartment with Crutchfield's 15-year-old son to look for Crutchfield.

{¶ 16} Once all the evidence was submitted, Brown's counsel requested a jury instruction on the lesser offense of aggravated assault, which the trial court denied.

Counsel did not request a jury instruction on self-defense. Rather counsel proceeded to defend Brown under the theory that the State had failed its burden to prove the elements of felonious assault. The jury, however, found Brown guilty of the felonious assault charge. Following the guilty verdict, the trial court sentenced Brown to a mandatory six years in prison.

{¶ 17} Brown now appeals from his conviction, raising a single assignment of error for review.

## Assignment of Error

{¶ 18} Brown's sole assignment of error is as follows:

THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO REQUEST A JURY INSTRUCTION FOR THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE AND BY FAILING TO HAVE THE JURY INSTRUCTED ON SUCH ISSUE.

{¶ 19} Under his single assignment of error, Brown contends that his trial counsel rendered ineffective assistance by failing to request a jury instruction on self-defense.

{¶ 20} In order to succeed on an ineffective assistance claim, Brown must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 21} To establish deficient performance, Brown must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688; *Bradley* at 142. In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955). Therefore, "[a]n appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic." *State v. Patterson*, 2d Dist. Greene No. 2015-CA-57, 2016-Ohio-2750, ¶ 15, citing *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). "Generally, the failure to request jury instructions is purely a matter of trial tactics and will not be disturbed upon review." *State v. Herrington*, 9th Dist. Summit No. 25150, 2010-Ohio-6455, ¶ 11, citing *State v. Clayton*, 62 Ohio St.2d 45, 47-49, 402 N.E.2d 1189 (1980).

{¶ 22} To establish prejudice, Brown must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688, 694; *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

{¶ 23} As previously noted, Brown argues that his trial counsel was ineffective in failing to request a self-defense jury instruction. " 'Self-defense is an affirmative defense, which means that the burden of going forward is on the defendant who must prove each

element by a preponderance of the evidence.' " *State v. Oates*, 2013-Ohio-2609, 993 N.E.2d 846, ¶ 10 (3d Dist.), quoting *State v. Kimmell*, 3d Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 19. (Other citations omitted.) "Affirmative defenses such as self-defense ' "do not seek to negate any elements of the offense which the State is required to prove" but rather they "admit[ ] the facts claimed by the prosecution and then rel[y] on independent facts or circumstances which the defendant claims exempt him from liability." ' " *Id.* at ¶ 10, quoting *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 32, quoting *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986).

**{¶ 24}** To establish self-defense, a defendant must introduce evidence showing that: (1) he was not at fault in creating the violent situation; (2) he had a bona fide belief that he was in imminent danger of bodily harm; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997), citing *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). (Other citation omitted.) Therefore, "[t]o support a claim for self-defense, a defendant must demonstrate that he acted out of fear, or he felt that his life was threatened." *State v. Crawford*, 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 26. In instances where less than deadly force is used, the defendant need only show a fear of bodily harm, not of death or great bodily harm. *State v. Gee*, 2d Dist. Miami No. 87-CA-22, 1987 WL 20260, *2 (Nov. 17, 1987); *State v. Perez*, 72 Ohio App.3d 468, 594 N.E.2d 1041 (10th Dist.1991).

**{¶ 25}** We note that there is no duty to retreat in cases involving nondeadly force. *State v. Kucharski*, 2d Dist. Montgomery No. 20815, 2005-Ohio-6541, ¶ 21, citing *Perez*. Moreover, R.C. 2901.09(B), also known as the "castle doctrine," creates an exception to

the general duty to retreat, as the statute provides that "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense[.]" The term " '[r]esidence means a dwelling in which a person resides either temporarily or permanently or is visiting as a guest." R.C. 2901.09(A); R.C. 2901.05(D)(3). In other words, a defendant has no duty to retreat "if he were lawfully occupying the residence at the time he used the force." (Citation omitted.) *State v. Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 18. Under such circumstances, the defendant need only establish the two remaining elements of a valid self-defense claim by a preponderance of the evidence, i.e., that he was not at fault in creating the situation, and that he had a genuine belief that he was in imminent danger of bodily harm. *Id.*; *State v. Johnson*, 11th Dist. Lake No. 2005-L-103, 2006-Ohio-2380, ¶ 21.

**{¶ 26}** In this case, the record indicates that Brown used nondeadly force and was lawfully occupying the residence at the time he used force on Randolph. Brown testified that he lived with Crutchfield at her apartment, and although Crutchfield testified otherwise, she nevertheless admitted to giving Brown a set of keys to her apartment where he spent the night and had permission to come and go at his leisure. Accordingly, Brown, at the very least, qualifies as a visiting guest who had no duty to retreat before using force in self-defense. As a result, in order to warrant a jury instruction on self-defense, Brown only needed to submit evidence demonstrating that he was not at fault in creating the situation giving rise to the altercation with Randolph, and that he had an honest belief that he was in imminent danger of bodily harm, i.e., that he acted out of fear of bodily harm.

**{¶ 27}** At trial, Brown provided the following testimony in his defense:

Defendant: So I'm going up the stairs, right? I get to the top of the stairs. I'm at the top layer of the stairs before I go to the checkerboard part, and he comes in there and rams me. All I can see is me going backwards. I grabbed his—I grabbed the hand railing and I start hitting him.

Defense Counsel: So you say he rammed you.

Defendant: Yeah, like tried to football tackle me downstairs.

Defense Counsel: What did you think that was—did it—were you afraid when that happened?

Defendant: Yes, I was. I mean it was steep stairs. I thought I was going –I was going backwards. I thought I was going to hurt myself. I was going backwards.

* * *

Defense Counsel: Okay. And then after he came at you, how did you feel?

Defendant: At first I was confused and then like I got angry because I felt like he was trying to hurt me. Like he was trying to push me back down the stairs.

Defense Counsel: Okay. Then you say you hit him.

Defendant: I hit him.

* * *

Defense Counsel: You're on the stairs. He tries to push you down. You hit him.

Defendant:        Yeah.

Defense Counsel:  Tell the ladies and gentlemen of the jury what happens after that.

Defendant:        Well, I grabbed him and I like hit him, right?   He's still holding on trying to take me down—down the stairs. We tussling right there, still hitting, swinging (sic) one another.   We fall down—I fall down the stairs. I grabbed the railing.   He kept going down the stairs.

* * *

Defendant:        [W]hen I went back downstairs, [Randolph is] still standing in the threshold, the threshold of the kitchen and the living room leaning against the wall, right? And told him to get the—I cussed at him and told him to get the hell out of the house.   We didn't want the— he's still in here.   And he started trying to take a step back and he's wobbly.   * * * He's not—he's not walking straight.   He's not actually walking at all for real.   He's like hobbling like.

Defense Counsel:  Okay.

Defendant:        You know, and so—not—to be honest with you, that's the only reason why I didn't beat him up more because he's defenseless.   He's—he couldn't do nothing with me.   I know I be—I be a punk to keep on whooping

somebody that can't defend their self.   * * *

Trial Trans. Vol. II. (Sept. 15, 2016), p. 263-270.

{¶ 28} Brown also provided the following testimony during the State's cross-examination:

| | |
|---|---|
| State: | So you didn't see Mr. Randolph until you got all the way back up the steps. |
| Defendant: | Until I got to the steps. |
| State: | Okay.   And where was Mr. Randolph according to you? |
| Defendant: | Coming from out of here and came to here. |
| State: | Well, you said he charged at you, right? |
| Defendant: | He did. |

* * *

| | |
|---|---|
| State: | So your testimony is that this guy gets ready to confront you and waits for you to come all the way back up the stairs so he can knock you back down the stairs? |
| Defendant: | That's what it looked like to me. |

* * *

| | |
|---|---|
| State: | All right. So you get one foot up and one foot on the stair and this guy lunges at you. |
| Defendant: | Yes, he does. |
| State: | Now if he had not lunged at you, you were still going to fight this guy, weren't you? |

Defendant:      No.

State:          No?   You weren't upset with this guy?

Defendant:      I was upset, but I'm—that don't mean I could fight him.
                I'll just tell him to get out.   Tell him to get out. * * *

* * *

State:          You were cursing because you're upset—

Defendant:      Yes.

State:          --right?   But you're not—as you walk up these stairs,
                in your mind you're not intending to touch this man, are
                you?

Defendant:      Not at first, no.

State:          No.

Defendant:      No.   I wasn't.   That wasn't my intention to go up there
                and beat this man up.

* * *

State:          You assaulted him because, according to your
                testimony, you were trying to defend yourself.

Defendant:      Yes, that was absolutely true.

Trial Trans Vol. II (Sept. 15, 2016), p. 304-307, 333.

{¶ 29} Brown's testimony, if believed, establishes that he was acting in self-defense from the moment the confrontation with Randolph began.   Brown specifically testified that Randolph initiated the confrontation by tackling him down the stairs, which Brown believed was an effort to hurt him.   Brown also testified that Randolph's act of

tackling him triggered a fear of being harmed, which caused him to hit Randolph in an attempt to defend himself. Brown claimed that he continued to hit Randolph after the initial tackle because Randolph was still trying to take him down the stairs. Brown further testified that once Randolph became defenseless from falling down the stairs and injuring his leg, he no longer attempted to fight him.

{¶ 30} Under Brown's version of events, Randolph was the initial aggressor whose actions caused Brown to believe that he was in imminent danger of bodily harm. Based on his testimony, the jury could have reasonably concluded that Brown purposefully used force to protect himself from Randolph. While Brown's counsel did not explicitly state that the evidence would establish that Brown was acting in self-defense when he fought with Randolph, it was a viable defense for the jury to consider. Nevertheless, counsel failed to request the trial court to instruct the jury on self-defense, but rather requested an instruction on the reduced offense of aggravated assault under the theory of serious provocation.

{¶ 31} The facts of this case are similar to that in *Patterson*, 2d Dist. Greene No. 2015-CA-57, 2016-Ohio-2750, wherein we held that counsel was ineffective for failing to request a jury instruction on self-defense. *Id.* at ¶ 22-25. In *Patterson*, the defendant testified regarding an argument with his live-in girlfriend that escalated into a physical altercation and resulted in the defendant being charged with attempted felonious assault. *Id.* at 6-8. According to the defendant, his girlfriend initiated the altercation by punching him; to which he responded by shoving her into a wall. *Id.* at ¶ 20. After he shoved her, the defendant testified that his girlfriend started to pull a handgun out from a dresser. *Id.* He claimed that this caused him to panic, and that he grabbed and jerked his girlfriend's

hand so she would drop the gun. *Id.* When the gun fell out of his girlfriend's hand, the defendant testified that they began to struggle and fight for possession of the gun on the floor. *Id.* The defendant specifically testified that he was scared his girlfriend would have shot him if she had obtained the gun. *Id.*

{¶ 32} Under the facts in *Patterson*, we held that the defendant's testimony, if believed, demonstrated that the defendant was not the initial aggressor and that he acted out of fear when he used force to protect himself against his girlfriend. *Id.* at ¶ 21. Accordingly, we held that self-defense was a viable defense for the jury to consider and that counsel's failure to request a jury instruction on self-defense fell below an objective standard of reasonableness. *Id.* at ¶ 22. We further held that the defendant was prejudiced by counsel's conduct because there was a reasonable probability that the jury "might" have concluded that the defendant had acted in self-defense. *Id.* at ¶ 23.

{¶ 33} We reached a similar decision in *State v. Fritz*, 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823 (2d Dist.). In *Fritz,* the jury found the defendant guilty of one count of assaulting a police officer after the defendant's trial counsel failed to request a jury instruction on self-defense. We held that the defendant's testimony indicated that the force he used against the officer was accidental. *Id.* at ¶ 23. Specifically, we stated that:

> Under Fritz's version of events, the officers were the aggressors and
> their actions caused him to believe that he was in imminent danger of bodily
> harm. Although Fritz testified that the injury to [Officer] Knight was not
> intentional, he specifically testified that he attempted to move Knight's hand
> from his face so that he could breathe. The jury could have reasonably

concluded that Fritz purposely used force to protect himself from his assailants. * * * In light of the testimony of the officers that they landed more than 30 blows to Fritz's body * * * and, more important, Fritz's testimony that Knight's hand caused him to be unable to breathe, there was evidence to support a conclusion that the officers used excessive or unnecessary force against Fritz and that Fritz reasonably attempted to remove Knight's hand from his face. Accordingly, Fritz's counsel should have requested an instruction on self-defense, and he acted unreasonably when he failed to do so.

*Id.* at ¶ 23-24.

{¶ 34} We further held that "there is a reasonable probability that the jury, if given an instruction on self-defense, might have concluded that Fritz had acted in self-defense." *Id.* at ¶ 25. We came to this conclusion because Officer Knight testified to having his hands in the area of Fritz's face and Fritz claimed that he moved the officer's hand because it obstructed his breathing. *Id.* Accordingly, we could not conclude that Fritz was not prejudiced by his trial counsel's failure to request the self-defense jury instruction. *Id.*

{¶ 35} Like in *Patterson* and *Fritz*, we find that the failure of Brown's counsel to request a self-defense jury instruction fell below an objective standard of reasonable representation because there was sufficient evidence in the record to support a claim of self-defense. Here, Randolph and Brown both testified that Randolph fell down the stairs during their altercation. Most importantly, Brown testified that he feared harm and acted in self-defense as a result of Randolph initiating the altercation. By not requesting the

instruction, counsel prohibited the jury from considering the possibility that Randolph sustained his injuries as a result of Brown fearing harm and defending himself. Given the specific circumstances of this case, we find that counsel's failure to raise a self-defense claim was outside the realm of legitimate trial strategy and qualifies as deficient performance.

{¶ 36} The State, however, contends that Brown cannot satisfy the prejudice prong of the ineffective assistance analysis because it believes the jury would have convicted Brown even if the self-defense instruction had been given. The State believes the jury would have convicted Brown regardless of the instruction because the only evidence of self-defense was Brown's self-serving testimony. However, the fact that Brown's testimony is the only evidence of his self-defense claim is immaterial, as his testimony, if believed, sufficiently establishes such a claim.

{¶ 37} The State also believes that Brown's conviction was evident regardless of the self-defense instruction because Brown's testimony lacked credibility and because both Crutchfield and Randolph testified that Brown was the unprovoked, initial aggressor. Nevertheless, Brown specifically testified that Randolph was the initial aggressor, and the credibility of all the testimony is for the jury to determine.

{¶ 38} Although the State challenges Brown's credibility, the record establishes that Crutchfield and Randolph's testimony had credibility issues also. For example, on direct examination, Randolph testified that he did not know Brown was Crutchfield's boyfriend or that she had a boyfriend, yet the responding police officer, Officer Jamie Luckoski, specifically testified that Randolph had reported to him that Crutchfield's "boyfriend" pushed him down the stairs. Trial Trans., Vol. I (Sept. 13, 2015), p. 204-205.

In addition, Crutchfield testified that Randolph knew Brown was her "friend," yet Randolph testified that he had never seen Brown before and did not recognize him when he caught a glimpse of him during the altercation.

{¶ 39} Randolph and Crutchfield also testified that they were not romantically involved, yet at the time of the altercation it was undisputed that Randolph and Crutchfield were upstairs in Crutchfield's bedroom drinking alcoholic beverages on her bed. That scenario could at least raise a question in the mind of a reasonable juror as to whether Randolph and Crutchfield were giving an honest depiction of what occurred on the night in question.

{¶ 40} In addition, Crutchfield initially testified that Brown did not say anything prior to the altercation, but immediately started punching Randolph at the top of her stairway. However, Crutchfield later testified that Brown had a pizza in his hand, and that prior to hitting Randolph, Brown gave the pizza to her 15-year-old son and told him to go downstairs and feed his brothers and sisters. Randolph, on the other hand, never testified regarding Brown having a pizza or speaking to Crutchfield's son. Rather, Randolph claimed he got hit right as he was exiting the bathroom and heading down the stairs. Brown also specifically testified that he did not have a pizza on the night in question.

{¶ 41} Crutchfield also admitted to lying to the responding police officer when she initially reported seeing no altercation between Brown and Randolph. She also failed to tell the responding officer about the choking incident. Crutchfield also testified that her memory gets better over time, which is highly unlikely, especially since Crutchfield was intoxicated on the night in question.

**{¶ 42}** Whether Brown, Crutchfield or Randolph's version of events is the most credible is not for the State or this court to decide. It is the province of the jury to determine which version is to be believed. Given the testimony and the various credibility issues, we find that that there is a reasonable probability that the jury might have accepted Brown's version of events and concluded that Brown acted in self-defense when he fought with Randolph. In other words, there is a reasonable probability that, but for counsel's failure to request the self-defense instruction, the outcome of trial would have been different, thus prejudicing Brown. Accordingly, the prejudice prong of the ineffective assistance analysis is also satisfied, making it appropriate to reverse Brown's conviction on the basis of ineffective assistance of counsel.

**{¶ 43}** Brown's sole assignment of error is sustained.

## Conclusion

**{¶ 44}** Having sustained Brown's sole assignment of error, the judgment of the trial court is reversed and the matter is remanded for further proceedings.

. . . . . . . . . . . . .

HALL, P.J. and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Kristin Arnold
Hon. Mary Katherine Huffman