[Cite as *State v. Grant*, 2020-Ohio-3055.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-13 |
| | : | |
| v. | : | Trial Court Case No. 2019-CRB-001- |
| | : | 225 |
| SHAWN H. GRANT | : | |
| | : | (Criminal Appeal from Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of May, 2020.

. . . . . . . . . . .

JESSE J. GREEN, Atty. Reg. No. 0040265, Assistant Prosecuting Attorney, Darke County Prosecutor's Office, 504 South Broadway, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

JENNIFER E. MARIETTA, Atty. Reg. No. 0089642, P.O. Box 37, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Shawn H. Grant appeals from his conviction for domestic violence. Grant contends the conviction must be reversed because the trial court erred in instructing the jury. He further contends he was not provided effective assistance of counsel. Finally, he claims the State did not present evidence sufficient to sustain the conviction and that the conviction was against the manifest weight of the evidence. For the reasons set forth below, we affirm.

## I.      Facts and Procedural History

{¶ 2} Grant resides in Arcanum with his son, Shane Grant. Grant's other son, Levon, resided next door with his girlfriend.[1] Levon was in Grant's home on April 16, 2019 when he, Grant, and Shane engaged in a physical altercation that left Levon with numerous injuries. Following an investigation, Grant was charged with one count of domestic violence in violation of R.C. 2919.25(A). The case proceeded to trial in August 2019.

{¶ 3} The State presented the testimony of Levon, who indicated he received a message from Grant that he (Grant) wanted to talk about his washing machine, which was not working. Levon went to his father's residence to try to fix Grant's washing machine. Levon testified he entered the house, "exchanged a couple pleasantries" with his father, then went downstairs to work on the washer. Tr. p. 66. He worked for approximately half an hour but was unable to figure out what was wrong with the machine. Levon testified he returned upstairs and informed Grant that he could not repair the

---

[1] Because the three men involved in the altercation share the same last name, we will refer to the defendant as "Grant," and we will refer to his sons by their first names.

washer. He then told his father he would research the issue and return later to work on the washer.

{¶ 4} According to Levon, his father began to speak to him in a derogatory manner and ordered him to get out of the house. Levon testified that he remained where he was and told his father to stop treating him badly. He testified that his father stood up and said, "get the f**k out now." Tr. p. 69. Grant then told Shane, who was standing behind Levon, to make Levon leave.

{¶ 5} Levon testified that Shane tapped him on the shoulder and told him he "probably should go." Tr. p. 69. Shane then tugged at Levon's arm. At that point, Levon began to yell at Grant. According to Levon, Grant raised his walking cane above his head and said, "get the f**k out or I'm going to kill you." Tr. p. 69-71. Levon testified that Grant told Shane to get Levon, at which point Shane grabbed Levon in a headlock and began punching him in the side of the head. Grant then hit Levon four times with the cane. Levon grabbed the cane, and he and Shane fell to the floor. Shane continued to hit Levon while Grant proceeded to throw a ceramic lamp and a shoe rack. Grant then dumped a bucket of tools onto the floor and retrieved a roofing hammer. Levon testified that he began to yell for help as Grant approached him with the hammer. Grant swung the hammer twice at Levon but failed to hit him. Another brother, who had been in the kitchen, yelled for everyone to stop. Levon was then able to crawl out the door and yell for help. He was taken to a local hospital by ambulance where he was treated for his injuries, which included multiple contusions and abrasions to his head as well as cuts to his legs and arms.

{¶ 6} The State also presented the testimony of Levon's girlfriend Rikki Roach who

lived with Levon and their infant. Roach was inside her house when she heard Levon yelling. Roach went outside to investigate and found Levon on the ground between the houses. She testified "the top of his head was bright red and he had light foam coming out of his mouth and he was complaining he couldn't breathe." Tr. p. 113-114. She testified that Grant began to scream at her and told her to keep Levon away from him or he would kill him. Roach called 911.

{¶ 7} Arcanum Police Officer Erika Cook responded to the scene, where she observed Levon on the ground in the yard. She testified that said he complained of difficulty breathing, and she noted white foam coming from his mouth. She testified that she followed the ambulance to the hospital where she took pictures of Levon's injuries, which included bruising to the entire right side of his head.

{¶ 8} After the State rested its case, Grant presented the testimony of Shane. Shane testified he was in the basement when he heard Levon and Grant arguing. He testified Levon refused to leave the house despite being told to do so. Shane testified he tried to slowly push Levon toward the door, but Levon kept trying to move toward Grant. Shane described himself as "sumo wrestling" with Levon in order to keep him from approaching Grant. Tr. p. 145. According to Shane, he and Levon fell to the floor and Levon landed on the shoe rack, which broke. He further testified that Levon broke the lamp when he tried to get up off the floor. Shane claimed he was eventually able to get Levon to the door and Levon then walked out of the house. He testified that neither he nor Grant followed. Shane testified that neither he nor Grant hit Levon.

{¶ 9} On cross-examination, Shane testified that Levon had come to the home at Grant's request to fix the washing machine. When asked, Shane was unable to account

for the cause of Levon's injuries.   However, he continued to deny having hit Levon and also denied placing him in a headlock.   He speculated that Levon had rolled in the gravel between the houses.   When the prosecutor asked him about discrepancies between his testimony and his statement to the police, Shane denied giving a false statement to the police.   The prosecutor then asked Shane if his statement had been accurate.   Shane stated, "I refuse to answer."   The trial court then asked why he would not answer and Shane stated, "It may incriminate me."   Tr. p. 163. The trial court ordered him to answer the prosecutor's question, in response to which Shane indicated that his statement to the police had been accurate except he had omitted "the detail of me pushing [Levon] to the door."   *Id.*

{¶ 10} The jury convicted Grant of domestic violence.   The trial court sentenced him to a term of 30 days in jail with 26 days suspended.   The parties agreed to restitution in the amount of $15,185, which represented the amount of Levon's medical bills.

{¶ 11} Grant appeals.

## II.      Self-Defense/Castle Doctrine

{¶ 12} Grant asserts the following as his first assignment of error:

THE JURY INSTRUCTIONS DID NOT INCLUDE AN INSTRUCTION REGARDING THE CASTLE DOCTRINE DEFENSE AND PRESUMPTION UNDER R.C. 2901.05(B).

{¶ 13} Grant contends the trial court abused its discretion by failing to instruct the jury on the castle doctrine and the presumption of self-defense when within one's own home.

{¶ 14} "A court's jury instructions must be based on the actual issues in the case as presented by the evidence. * * * Thus, a court should not give an instruction unless it is specifically applicable to the facts in the case." *State v. Fritz*, 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 19 (2d Dist.), citing *State v. Guster*, 66 Ohio St.2d 266, 421 N.E.2d 157 (1981) (additional citations and internal quotation marks omitted). "Ordinarily, the trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion." *State v. Lipkins*, 2017-Ohio-4085, 92 N.E.3d 82, ¶ 28 (10th Dist.), citing *State v. Teitelbaum*, 2016-Ohio-3524, 67 N.E.3d 85, ¶ 127 (10th Dist.). In this case, the plain-error standard applies in our review of this claimed error, because Grant did not request or object to the failure to give instructions on self-defense or the castle doctrine.

{¶ 15} A defendant is entitled to an instruction on self-defense when the evidence establishes "(1) that he was not at fault in creating the violent situation, (2) that he had a bona fide belief that he was in danger of imminent death or great bodily harm and that the only means of escape was by use of force, and (3) that he did not violate any duty to retreat or avoid the danger." *State v. Reid*, 2019-Ohio-1542, 135 N.E.3d 517, ¶ 20 (1st Dist.).

{¶ 16} The castle doctrine relates to the duty to retreat element of self-defense because it recognizes an exception to the duty to retreat when a defendant is in his own home. *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, ¶ 6. The "doctrine takes its name from the maxim that a person's home is his or her 'castle.' " The doctrine is codified at R.C. 2901.09(B), which provides that "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense

of another, or defense of that person's residence."  (Citations omitted.)  *State v. Martin*, 2d Dist. Montgomery No. 27220, 2017-Ohio-7431, ¶ 40.

{¶ 17} "In 2008, the Ohio General Assembly, with the enactment of S.B. No. 184, expanded the reach of the Castle Doctrine under the common law by creating a presumption under former R.C. 2901.05(B)(1) that a person acts in self-defense 'when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used * * * has unlawfully and without privilege to do so entered the residence * * * occupied by the person using the defensive force.' " *State v. Guice*, 2019-Ohio-1324, 133 N.E.3d 874, ¶ 36 (10th Dist.).

{¶ 18} Self-defense is a defense that acts to relieve a defendant of criminal liability for any force the defendant used.  *State v. Kozlosky*, 195 Ohio App.3d 343, 2011-Ohio-4814, 959 N.E.2d 1097, ¶ 22 (8th Dist.).  Significantly, the defense does "not seek to negate any of the elements of the offense which the State is required to prove." (Citations omitted.)  *State v. Brown*, 2017-Ohio-7424, 96 N.E.3d 1128, ¶ 23 (2d Dist.). Instead, a claim of self-defense rests upon the admission of the conduct claimed by the State as to the underlying offense and then relies on other facts and circumstances to exempt the defendant from liability for the use of that force.  *Id.*

{¶ 19} To prove that Grant committed domestic violence, the State was required to establish that he knowingly caused or attempted to cause physical harm to Levon. The State presented Levon's testimony, which indicated both that Grant hit him in the head with the cane and attempted to hit him with a hammer.  The State also presented evidence of physical harm.  At no time did the defense admit the facts claimed by the prosecution.  While Grant did not testify at trial, he attempted to negate the elements of

the offense through Shane's testimony that Grant never hit, or attempted to hit, Levon with either the cane or the hammer.

{¶ 20} This record demonstrates that self-defense was not a theory of the case pursued by Grant at trial. Instead, Grant's trial strategy was based upon the claim that he was not physically involved in the altercation and never hit Levon. This theory of the case suggests that he did not act knowingly and did not cause physical harm to Levon. Such a strategy is inconsistent with self-defense, which concedes that the defendant had the purpose to commit the act, but asserts that he was justified in his actions. In other words, Grant could not have been acting in self-defense if, as he claims, he did not act at all.

{¶ 21} Based upon this record, we conclude Grant's trial strategy sought to convince the jury that he did not cause or attempt to cause physical harm to Levon. Therefore, we conclude that instructions on self-defense, the castle doctrine and the presumption set forth in R.C. 2901.05(B) were not justified, and the trial court did not commit error, let alone plain error, in failing to give such instructions.

{¶ 22} Accordingly, the first assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶ 23} Grant's second assignment of error states as follows:

COUNSEL FOR DEFENDANT WAS INEFFECTIVE, SUCH THAT THE OUTCOME OF THE TRIAL WAS NEGATIVELY IMPACTED BY COUNSEL'S PERFORMANCE.

{¶ 24} Grant claims he was denied the effective assistance of counsel at trial.

Specifically, he asserts counsel was deficient with regard to jury selection and jury instructions. He also asserts counsel was ineffective because he failed to raise objections to questions asked by the prosecutor.

{¶ 25} To succeed on an ineffective assistance claim, a defendant must establish his trial counsel's performance was deficient and the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697. In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

{¶ 26} We begin with the jury instructions. Grant claims counsel should have asked for jury instructions on self-defense and the castle doctrine. In support, he cites this court's holdings in *State v. Brown*, 2017-Ohio-7424, 96 N.E.3d 1128 (2d Dist.), *State v. Patterson*, 2d Dist. Greene No. 2015-CA-57, 2016-Ohio-2750, and *State v. Fritz*,163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823 (2d Dist.) for the proposition that counsel is ineffective for failing to request such instructions.

{¶ 27} "Generally, the failure to request jury instructions is purely a matter of trial tactics and will not be disturbed upon review." *State v. Herrington*, 9th Dist. Summit No. 25150, 2010-Ohio-6455, ¶ 11, citing *State v. Clayton*, 62 Ohio St.2d 45, 47-49, 402

N.E.2d 1189 (1980). However, in the cases cited by Grant, we found counsel ineffective for failing to request self-defense instructions because there was some evidence presented in each case upon which jurors could have found the defendant acted in self-defense. Specifically, in *Brown,* the defendant admitted to hitting the victim. *Brown* at ¶ 14. Likewise, the defendant in *Patterson* testified that he shoved the victim and also pushed the victim into a wall. *Patterson* at ¶ 7. The defendant also testified he hit, bit and slapped the victim. *Id.* Finally, in *Fritz*, the defendant testified that he used force to remove his perceived attacker's hand from his face. *Fritz* at ¶ 23.

{¶ 28} As stated above, there was no evidence presented in this case upon which a jury could find Grant acted in self-defense. This failure was designed to demonstrate Grant did not use any force whatsoever against Levon. Trial counsel was not required to seek instructions that were incompatible with that chosen trial strategy. Accordingly, we cannot conclude trial counsel's conduct was deficient in this regard.

{¶ 29} Grant next asserts trial counsel was deficient regarding the selection of the jury. Of relevance to this claim, the record reveals the parties concluded jury questioning and the State declined to utilize any of its peremptory challenges. Thereafter, Grant used his allotted peremptory challenge to excuse a juror, and another juror was called into the box. This juror, to whom we will refer as Juror X, had previously indicated that he was neighbors with Officer Cook. In response to additional questions about his relationship with Cook, Juror X stated, "We - - you know, we see each other out, we say 'hi.' We communicate. We don't snub each other but we don't - - we're just in passing. We don't go hang out at each other's house or anything." Tr. p. 45. Juror X also indicated he would be fair and impartial in deciding the case. Grant sought to remove

Juror X for cause but the trial court denied the request.

{¶ 30} Grant argues "the Prosecutor outmaneuvered Defense Counsel in Jury Selection so as to place a neighbor of the investigating officer on the jury." He also notes, "although it may not suffice for a challenge to ineffective assistance, as all the right words were said, the inclusion of the neighbor is questionable. It does raise questions about Counsel's ability to participate in the selection of a fair and impartial jury pool for Mr. Grant."

{¶ 31} There is no evidence trial counsel improperly or imprudently exercised his allotted peremptory challenge on a different juror. Further, the record demonstrates counsel properly attempted to establish a basis for removal of Juror X through additional voir dire questioning. Finally, counsel requested removal for cause. Nothing asserted by Grant or set forth in the record compels us to conclude that counsel was deficient in this regard.

{¶ 32} Grant also claims counsel improperly permitted the prosecutor to provide testimony regarding the State's exhibits. During trial, the State introduced 11 pictures of Levon's various injuries. As previously stated, the pictures were taken by Cook. The pictures were initially introduced during Levon's testimony during which the prosecutor properly asked Levon to describe what was depicted in each picture. Thereafter, during Cook's testimony, the prosecutor showed Cook three of the photographs and repeated Levon's testimony regarding what was shown in the pictures. The prosecutor then asked Cook if she agreed with the descriptions.

{¶ 33} We note that the prosecutor identified what was depicted in each picture as previously described by Levon. For example, Levon described State's Exhibit 2 as

showing a cut to his chin. The prosecutor later asked Cook whether the picture showed a cut to Levon's chin. It is entirely possible that defense counsel did not object to these questions simply because the prosecutor merely repeated Levon's descriptions of the injuries depicted. Or counsel may have felt objecting would bring more attention to the injuries. In any event, we cannot say that counsel's conduct was deficient or that any deficiency resulted in prejudice.

{¶ 34} Grant's last claim of ineffective assistance of counsel is based upon the assertion that counsel failed to lodge proper objections to numerous questions posed by the prosecutor. First, Grant contends the prosecutor asked Levon two questions regarding his medical care which called for answers containing hearsay evidence. Specifically, the prosecutor asked Levon if he was advised he had "concussion like symptoms," and what he was advised to do for "self-care." Tr. p. 107. Defense counsel did not object to either of these questions.

{¶ 35} Levon indicated that he believed he lost consciousness while he was on the ground. He further indicated he was unable to open his eyes while he was being treated at the hospital because he was suffering a migraine headache. He testified his symptoms also included nausea. The prosecutor then asked him the above questions. Levon responded that he was informed he had concussion-like symptoms and was told to take ibuprofen.

{¶ 36} We agree that the questions, as asked, sought answers based upon hearsay evidence. Had the prosecutor asked Levon what he did for self-care once discharged, Levon would have been permitted to answer. Counsel may have determined that objecting to these questions was not necessary or that doing so would

have brought more attention to the matter.[2]  Even assuming counsel was deficient for failing to lodge objections, we cannot discern any prejudice.  Levon's answer did not actually establish a diagnosis and his self-care orders were minimal.

**{¶ 37}** Next, Grant contends the prosecutor asked leading questions to which defense counsel failed to object.   Specifically, Grant objects to the following exchanges during re-direct examination between the prosecutor and Roach:

Q:   Now it wasn't just, "I'll kill you.   It's "next time, I'll kill you," correct?

A:   Yes.   "Next time."

Q:   - - there was an attempt this time.

A:   Next time.

Q:   Is that the way you read that?

A:   Um-hmm.

* * *

Q:   I understand you were upset and nervous and you're probably upset and nervous today; is that fair to say?

A:  Yeah.

Q:   Okay.   But that is what came out of the Defendant's mouth.   Is that what you're testifying today?

Tr. p. 121-122.

**{¶ 38}** A review of the entire record shows that during direct examination, Roach testified she heard Grant threaten to kill Levon.   During cross-examination, defense

---

[2] We note counsel raised an objection to the very next question, wherein the prosecutor sought to have Levon recount whether his doctors related his injuries to Grant's actions.

counsel noted Roach had not included that information in her statement to the police and that she had not filed an amended statement adding that information. Immediately thereafter on re-direct examination, the prosecutor asked Roach whether she had made such a statement to the police. After Roach stated she believed she had made the statement when speaking to the police, the prosecutor engaged in the above-cited colloquy.

{¶ 39} Even if the questions regarding the statement were leading, we fail to discern how they resulted in prejudice. The prosecutor was merely following up on statements already put into evidence by the witness. Likewise, while the prosecutor did ask a leading question regarding whether Roach was nervous and upset, we cannot discern any prejudice arising therefrom.

{¶ 40} Finally, we note Grant's that claim that counsel "struggled with objections throughout the trial" is not borne out by the record. Grant admits, and the transcript demonstrates, defense counsel made valid objections throughout the trial.

{¶ 41} We conclude Grant has failed to demonstrate ineffective assistance of counsel. Accordingly, the second assignment of error is overruled.

## IV. Sufficiency and Manifest Weight of the Evidence

{¶ 42} The third and fourth assignments of error are as follows:

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTION FOR DOMESTIC VIOLENCE.

THE CONVICTION FOR DOMESTIC VIOLENCE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 43} Grant contends the State failed to present evidence sufficient to support the conviction and that the conviction is against the manifest weight of the evidence. He asserts the State failed to establish the elements of domestic violence. He further claims there was a dispute in the testimony regarding whether he was physically involved in the altercation. Finally, he contends the State failed to rebut the presumption he was acting in self-defense or that he was "acting in accordance with the Castle Doctrine in ejecting Levon Grant" from his home.

{¶ 44} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 45} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence

is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a " 'court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 46} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 47} Finally, and importantly, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 48} Grant was convicted of domestic violence in violation of R.C. 2919.25(A), which provides "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."  "Family or household member" is defined to include "a child of the offender" "who is residing or has resided with the offender."  R.C. 2919.25(F)(1)(a)(ii).  "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist."  R.C. 2901.22(B).  "Physical harm" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."  R.C. 2901.01(A)(3).

{¶ 49} There is no dispute that Levon is Grant's family member, and Levon's testimony, if believed, was sufficient to demonstrate the elements of domestic violence.  Specifically, Levon testified Grant hit him at least four times with a wooden cane.  Levon also testified Grant attempted to hit him with a hammer.  The jury could have reasonably inferred that Grant acted with knowledge that either of these actions could result in physical harm.  Further, the State presented competent evidence that Levon did suffer physical harm.  Thus, we conclude the State presented sufficient evidence to sustain the conviction.

{¶ 50} Grant next contends that the jury should not have credited the testimony of Levon over the testimony of Shane, and that the existence of conflicting testimony precluded the jury from finding him guilty beyond a reasonable doubt.  Upon review, however, we do not agree that the jury clearly lost its way in choosing to believe the testimony of Levon and to disbelieve the testimony presented by Shane.  A trier of fact

is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Wright*, 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25. Moreover, the existence of conflicting testimony does not preclude the State from obtaining a conviction. As noted in *Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541, one function of a jury is to resolve such conflicts when they arise. Thus, we conclude the conviction was not against the manifest weight of the evidence.

{¶ 51} Finally, for the reasons set forth above, the record does not contain evidence upon which the jury could have found Grant acted in self-defense. Therefore, the State had no presumption to rebut.

{¶ 52} We cannot conclude the jury lost its way in resolving the testimonial conflicts in favor of the State. We further conclude the testimony provided by Levon was sufficient to support the conviction. Accordingly, we conclude the conviction was supported by sufficient evidence and was not against the weight of the evidence.

{¶ 53} The third and fourth assignments of error are overruled.


## V.      Conclusion

{¶ 54} All of Grant's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


FROELICH, J. and HALL, J., concur.

Copies sent to:

Jesse J. Green
Jennifer E. Marietta
Hon. Julie L. Monnin