[Cite as *State v. Wright*, 2019-Ohio-4803.]


# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28254 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-1456 |
| | : | |
| DEVIN WRIGHT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 22nd day of November, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

WILLIAM O. CASS, JR., Atty. Reg. No. 0034517, 135 West Dorothy Lane, Suite 117, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** Devin Wright was convicted following a jury trial on one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree. The trial court imposed a two-year prison sentence. Wright appeals from his conviction. We hereby affirm the judgment of the trial court.

**{¶ 2}** Wright was indicted on one count of felonious assault on May 8, 2018. On June 13, 2018, he filed a motion to suppress. On July 18, 2018, Wright filed a request for a competency evaluation, and the court ordered such an evaluation. On October 4, 2018, the court overruled Wright's motion to suppress after a hearing and found Wright competent to stand trial based on a psychiatric report.

**{¶ 3}** On October 31, 2018, the State filed a motion in limine, requesting a pretrial ruling on the issue of character evidence. The State filed a second motion in limine on November 15, 2018, seeking to exclude evidence of Wright's diminished mental capacity.

**{¶ 4}** Also on November 15, 2018, Wright filed a notice of his intent to offer an affirmative defense of self-defense and defense of others. In response, the State filed a motion in limine seeking to prevent Wright from making statements or seeking an instruction about self-defense. Specifically, the State asserted that the witnesses at trial would testify that Wright and his associates were the "first aggressors," that Wright admitted that the victim was not armed and never hit, struck, or attempted to hurt anyone, and that Wright "never attempted to retreat when in an open parking lot but instead escalated an argument by attacking the victim." Wright opposed the State's motions in limine.

**{¶ 5}** On November 21, 2018, Wright filed a motion in limine to exclude cumulative

evidence regarding the victim's injuries and to exclude recorded jail telephone calls as hearsay and prejudicial. Two days later, Wright requested a jury instruction on "the lesser offense of misdemeanor assault." On November 26, Wright filed a supplemental memorandum requesting jury instructions on both misdemeanor assault and aggravated assault. The trial was held on November 26-28, 2018.

{¶ 6} At trial, Ronnie Evans, age 44, testified that on April 7, 2018, he and his fiancée, Andrea Anderson, went to Connell's bar in Dayton at around 9:00 or 10:00 p.m. Evans went there to speak to his friend, Lloyd McGee, who was "running the karaoke" at the bar. Evans testified that he remained in the bar for 15 to 20 minutes and then left because he "was getting some very uncomfortable looks from across the room." Evans recognized "Amanda" across the room as someone "from another establishment" where Evans himself worked as a karaoke D.J. He stated that he asked McGee to follow him and Anderson outside, where he "was met by a group of people." Evans stated that McGee walked them to the front door and stopped, and that he (Evans) was approached by three men "closer to the back of [his] car" in the parking lot. Evans testified that one of the men, named "Tommy," whom he did not know, accused him of previously hitting his sister, Amanda Mason,[1] the woman Evans recognized inside the bar. Evans testified that he responded, "I've never touched your sister."

{¶ 7} The following exchange occurred with the prosecutor:

Q. At that point, did he threaten you?

A. Not - - not verbally threaten, but just being approached by three

---

[1] For clarity, we will refer to Tommy Mason and his sister Amanda Mason by their first names.

gentlemen in a dark parking lot that you don't know is threatening to me, personally.

      \* \* \*

Q. Did you verbally threaten him?

A. No, I did not.

      \* \* \*

Q. Did you imply in any way that you had a weapon on you?

A. No, I did not.

      \* \* \*

Q. \* \* \* And then what happens at that point?   So you have Tommy in front of you.   You have two males on each side of you.   What happens?

A. Well, as I am pleading my \* \* \* innocence in, you know, I guess whatever happened with his sister, I basically got punched.

Q. Do you know who punched you?

A. Yes, I do.

Q. And did you know that person before the incident?

A. Absolutely not.

{¶ 8} Evans identified Wright as his assailant. He testified that he fell to the ground, covered his face with his hands in a fetal position, and "received a couple kicks." Evans testified that the men then proceeded to their vehicle, and he "rushed" to get into his own vehicle.   Evans testified that he attempted to follow the other vehicle, and as he did so "there was a police officer that pulled up."   Evans stated that he jumped out of his car and told the officer, "that car right there that's got the brake lights on still, \* \* \* they

just beat the hell out of me."

{¶ 9} Evans subsequently drove a few blocks in the direction of the hospital and then pulled over due to pain in his head. He testified that Anderson then drove him to Miami Valley Hospital ("MVH"). He stated that an officer responded to the hospital, and that he (Evans) provided the officer with a partial plate number from the other vehicle. Evans testified that he was x-rayed at the hospital and given "multiple types of medication" to try to relieve his pain, which was "pretty excruciating." Evans testified that the x-rays revealed that both of his cheek bones and his left eye socket were "shattered," his nose was broken, and he had to have an emergency reconstructive surgery the next morning. Evans testified that, while in the hospital, he was able to identify Wright via Facebook by searching for Amanda's brother, Tommy. Specifically, after Evans found pictures of Amanda's brother Tommy on Facebook, he found pictures of Wright and her brother together.

{¶ 10} Evans testified that he had surgery on April 8, 2018, and that thereafter his "mouth was wired shut for six weeks." He was required to eat through a straw and lost 28 pounds in six weeks. Evans testified that he had "never been through this much pain" prior to his surgery and that it was "one of the worst experiences" of his life. He stated that he still had a lot of pain after the surgery. Evans testified that he "had a couple different pain meds," and that he "had to take a liquid antacid, because of all the reactions that I was getting from it was giving me a lot of heartburn, a lot of * * * discomfort in my chest." Evans testified that he tried to discontinue the pain medication early so that he could return to work, where he operated a concrete truck, and he missed six weeks of work. Evans also testified that he still experienced numbness "all over [his] face" and

that he was unable to eat certain foods because of problems with chewing and biting.

{¶ 11} On cross-examination, Evans testified that he came to recognize Amanda Mason in the course of his work as a karaoke disc jockey. He stated that on March 3, 2018, Amanda Mason got into a fight with his sister while he was working at a bar, and that he did not intervene in the fight. Evans testified that the bar owner and "his people" dealt with the incident.

{¶ 12} Andrea Anderson resided with Evans and his four children. She testified that she was the primary caregiver for Evans's children and had to be "the breadwinner" when Evans was assaulted and could no longer work. She testified that on the night of Evans's injury, she observed Tommy and Amanda, Wright, and another female in Connell's bar; a couple of the individuals in that group left the bar before she and Evans did. Anderson stated that, as she and Evans left the bar and approached their vehicle, "there was about five or six of them that came out from behind the Jeep Liberty that was parked" in the parking lot. She testified that she heard Tommy "hollering" at Evans and asking if Evans "liked to hit women." Anderson stated that Evans "verbally" defended himself without raising his hands, and that at the same time she was "being confronted" by Amanda, who was standing in between Anderson and Evans.

{¶ 13} The following exchange occurred on direct examination:

Q. Amanda was in your face, talking to you. And Ronnie [Evans] was dealing with two, maybe three other people, men, correct?

A. Yes.

Q. Were the men he was talking to larger than he was?

A. Yes.

Q. Substantially?

A. Yes.

Q. Were you able to watch what has happening with Ronnie the whole time that Amanda was talking to you?

A. No, I was not. She was being more of a distraction to me.

* * *

Q. Was there a time that you were able to look over and see Ronnie?

A. Yes.

Q. And what did you see?

A. I seen him trying to resolve the conflict as best he could without any physical altercation. He was taking steps back to try to separate himself from them. And that's really all I did get to see.

Q. And then * * * you turned your attention back to Amanda?

A. Yes.

Q. And then did you see something else when you turned around and saw Ronnie again?

A. He was on the ground.

* * *

Q. Did you see anyone hit Ronnie?

A. No, I did not.

Q. Did you see anyone kick Ronnie when he was on the ground?

A. No, but I did see * * * Tommy Mason try to kick him. But he was

not close enough, so it did not make contact.

* * *

Q. * * * And did you see anybody else around him try to kick him?

A. No, I did not. They were all, at that point, trying to leave.

* * *

Q. So the group that was around you and around Ronnie were moving pretty quickly to that Jeep?

A. Yes.

{¶ 14} Anderson testified that as Evans attempted to follow the Jeep, he was "speaking out the letters and numbers on the license plate so that I could write it down."

{¶ 15} With respect to a prior incident, Anderson testified that on March 3, 2018, Evans was working as a karaoke DJ at Carmichael's Pub, and she observed "Amanda Mason and [Evans's] sister, Dawn * * * in a physical altercation * * * down by the bar." She stated that the DJ booth was in the front of the establishment and the bar was in the back. Anderson testified that Evans did not leave the DJ booth in the course of the altercation.

{¶ 16} Officer Jacob Hemmelgarn of the Dayton Police Department testified that he was on road patrol on April 8, 2018, when he was dispatched to MVH on the report of an assault. When he arrived, Evans had been admitted, and Hemmelgarn proceeded to his room. Hemmelgarn testified that Evans's face was swollen and discolored, and that he was having trouble speaking. Hemmelgarn identified as State's Exhibit 2 a photograph taken by him of Evans's face. Hemmelgarn testified that he remembered hearing over the radio earlier in the evening that Officer Steven Quigney had been flagged

down while on duty, and Hemmelgarn called him and "was able to gather a license plate * * * from the suspect vehicle," which was a black 2004 Jeep.

{¶ 17} Detective Nathan Via of the Dayton Police Department testified that he was assigned to the homicide unit and was the lead detective on Evans's assault case.   Via testified that he met Evans at the police department on April 11, 2018, and that Evans was still in a lot of pain and his mouth was wired shut. Via testified that he identified Wright as a suspect after speaking to Evans.   Via interviewed Wright after advising him of his rights.   Via stated that Wright told him that he, Tommy and Amanda Mason, and Ashley Vanderpool began their evening at Tommy's home and then proceeded to Setter's, where the group was "thrown out" for underage drinking   Via engaged in the following exchange with the prosecutor:

Q.   * * * [W]hat did he tell you after that?

A.   They went to Connell's Bar then. And upon arriving at Connell's, they were inside and at that time, Amanda pointed out that Ronnie * * * Evans was in there at that time.   The bartender did notice eventually that [Wright] looked like he was underage, so again, he was carded and tossed out of the bar.

And when he left the bar, he went out to the parking lot and he sat in the Jeep that they'd come in.   He began drinking some more.   I believe they had a bottle, if I'm correct, of Crown Royal is what he'd said.   * * * Amanda Mason came outside.   And at some point, [Wright] got out of the vehicle.   He walked up to [Evans] and struck him one time in the face with a closed fist.   He said that [Evans] had made no advances toward him.   He

didn't indicate that he had any kind of weapons.

Q. And * * * he's talking about Mr. Evans?

A. He's talking about [Evans].

Q. Okay.

A. Ronnie Evans. But that he had punched him one time in the face. He also stated that after that * * * the group left but he did not see anybody else kick, strike or do anything to [Evans], other than his one, single punch.

Q. Did he indicate if Ronnie Evans ever threatened him before the punch?

A. He stated that [Evans] had made a statement about getting some friends of his from a biker gang to defend him. But obviously those people were nowhere around and were not there that evening.

Q. But he never threatened him with a weapon or anything?

A. Correct.

* * *

A. * * * [Wright] was very clear to me he did not see a weapon.

* * *

Q. What about Tommy? Did he say if - - if Mr. Evans approached Tommy or if Tommy approached Mr. Evans?

A. He said Tommy approached Mr. Evans.

{¶ 18} Via identified photos taken by him of the Jeep parked in front of Tommy Mason's house, bearing the same license plate number as provided by Evans on the

night of his injury. Via testified that Wright was placed under arrest for assaulting Evans. He also testified that Wright is over six feet tall and Evans is five feet seven inches tall.

{¶ 19} Dr. Michael Monto of the Center for Facial and Oral Surgery testified that he was "on staff through the plastic surgery department at [MVH] to do maxillofacial trauma calls." On April 8, 2018, he treated Evans, who had "mid-facial fractures in the bones of his face." Monto stated that, with Evans's type of injury, there can be "permanent injuries resulting from the trauma," so it was important to "stabilize his sort of injuries sooner, rather than later," to prevent long-term problems. Monto testified that, prior to surgery, Evans was tested for drugs and alcohol, and that "it was a clean tox screen."

{¶ 20} Monto testified that he performed surgery on Evans after performing a comprehensive medical exam under anesthesia and reviewing his x-rays. Monto testified that "[i]t's usually a pretty significant blunt trauma that will cause this type of injury." He testified that he performed "an open reduction with internal fixation of his mid-facial features." Monto described that he made an incision inside Evans's his mouth on the left side, "from the back of the top jaw and carried it around, underneath the lip." Monto testified that "then we lift the tissue up to the level of his - right below his eyes, inferior orbital rim, and down to the crest of the bone or the aveolar bone." Monto stated that Evans's jaws were wired together "to give him a good bite, because his bite was not reproduceable [sic] * * * the way his top jaw was broken." According to Monto, the top jaw was wired to the bottom jaw, then the bones were put "in good anatomic position," then "they're held that way while plates and screws are secured to the bones to hold them in place." He stated the surgery lasted two to three hours, and that Evans was prescribed

medication for pain, inflammation, and infection when he was discharged.

**{¶ 21}** Monto identified post-operative x-rays of Evans's injuries. He testified that "we saw him pretty much every week after the surgery, just to make sure that the incisions were healing, that the wires were still tight, that the bones were in a good place, that he was maintaining his nutrition, no signs of infection" for a period of six weeks. Monto testified that, at six weeks, some of the braces, bolts, and wires were removed, while others remained in place. Monto stated that Evans experienced "post-operative paresthesia or numbness" on the left side of his face, which was improving.

**{¶ 22}** Finally, the following exchange occurred:

Q. * * * Based on your training and experience and the patients that you've treated, could these injuries have been cause by a closed fist punch to the face?

A. Yes. That's what I would consider blunt force.

* * *

Q. * * * There's injuries to both the left and right side. Could these injuries have been caused by just being hit on one side?

A. Yes.

Q. And can you explain how that's possible?

A. With - - especially with the maxilla and mandible, the top and bottom jaw, the way that they're formed, or they're kind of U-shaped bones. And the mandible is more hollow. The maxilla is U-shaped with an arch, or a hard palette in the center. And the bone in the center is more dense. So you can be hit on one side and the denseness of the bone will prevent

the jaw from splitting in the middle. But the force will cause it to break on the other side.

So it's very unusual, I would say, to have a single break in either the top or bottom jaw. It's almost always on both sides, just because of the nature of the - - the density and design of those bones.

Q. During the treatment of Mr. Evans, did you observe any pre-existing condition that would have made him more acceptable [sic] to an injury?

* * *

A. So people who are smaller in stature tend to have thinner * * * bone. People who are bigger in stature tend to have more dense, thicker bone. So somebody who's of smaller stature would be less likely to sustain a blow without receiving significant injury than someone who's of bigger stature.

Q. Would you consider Mr. Evans a person of smaller stature?

A. I would, yes.

* * *

Q. * * * Would you consider this type of break a common break for a person who's been punched in the face?

A. I don't know if I'd say common * * *. People get punched in the face and they don't necessarily break (indiscernible). So I think you have to have a pretty significant punch to cause this sort of injury. So it wasn't like * * * a fleeting or glancing blow. It was a solid shot that – that did this.

Q. So this injury was not a person who did a - - just a one punch to the face? This is - -

A. Well, * * * it could've been one punch, but it would have to be a solid one punch.

Q. So not someone who - - a quick jab?

A. Right.

Q. This would have required a substantial amount of force?

A. Right.

{¶ 23} At the conclusion of the State's evidence, Wright moved for an acquittal and the court overruled the motion.

{¶ 24} Amanda then testified on behalf of Wright. Amanda testified that she and Evans's sister got into a fight before Evans's injury, and that after their fight, Evans "punched [her] in my right side of my eye." She testified that Wright was her friend, that she was with him on April 7, 2018, at Connell's bar, along with Tommy, and Ashley Vanderpool, and that Vanderpool owned the black jeep. Amanda stated that she observed Evans and Anderson arrive at Connell's. She testified that she and Tommy decided to leave, and as they were doing so, followed by Evans, Tommy commented to Evans that he "heard you like to punch girls." Amanda testified that Evans "charged" them and threatened "that he was going to have his biker friends come and help him beat up Tommy."

{¶ 25} Amanda testified that Wright then approached them "to see what was going on," and at the same time Evans charged toward Wright. Amanda stated that someone yelled, "he has a knife"; when she turned around, she heard something behind her but

was unsure what it was, then saw Evans "sitting on the ground." Amanda testified that she extended her hand to Evans "and helped him up, and that was it. And everybody went on their way." She stated that no one else was around Evans when he was on the ground. Amanda testified that Evans also told Wright that he was going to have his biker friends come and beat Wright up; she stated that Wright appeared frightened, but she did not see Wright put his hands on Evans and did not see anyone touch Evans at all, because she had turned away.

{¶ 26} On cross-examination, Amanda testified that Wright and Vanderpool left Connell's ahead of her and her brother. She stated that Wright did not hit Evans, because Wright "was in front of me the whole entire time." Amanda testified that police officers took statements after her alleged fight with Evans at Carmichael's; she "told the cops multiple times" that Evans had hit her, "but maybe because they thought [she] was drunk," they did not seem to believe her or thought she had the wrong person. She stated that the officers who responded to Carmichael's allowed Evans to "get in his truck and drive off." Amanda acknowledged that she chose not to file charges against Evans.

{¶ 27} Tommy testified that he was with Wright on April 7, 2018, at Connell's bar. He stated that, when Evans entered the bar, he recognized Evans as the "guy that punched my sister." Tommy testified that, at the time, he (Tommy) had just had casts removed from both of his elbows. According to Tommy, when he confronted Evans about hitting his sister, Evans said "he was going to get both of his sons to beat [Tommy] up." Evans was getting loud and put his hand in his hoodie pocket, "like he's grabbing a knife or something," whereupon Wright, who knew that both of Tommy's elbows had been broken, "must have got scared or something" and punched Evans. Tommy testified that

the punch "wasn't hard at all" and that his group left because they saw the "cops."

{¶ 28} Wright, age 20, testified that he was at Connell's bar with Tommy and Amanda Mason and Tommy's girlfriend, Ashley, on April 7, 2018. He testified that, while playing pool there, he became very dizzy and asked Amanda to take his place in the game. He then observed Evans and Andrea Anderson enter the bar and go back into the corner. Wright testified that, as he sat down, the person who ran the bar came and asked for identification from his group. Wright testified, "that's when I looked at Tommy and said, I left my ID at your house. I'm already too drunk." According to Wright, Ashley then suggested that they "take more shots of Crown into [sic] the Jeep." Wright stated that he, Ashley, and another girl named Destiny proceeded to the Jeep and got inside; he was in the backseat. Ashley and Destiny did shots, and "then as they passed it back to me, I just heard a bunch of yelling." He testified that Ashley stated, "I think Tommy's about to get into a fight."

{¶ 29} Wright testified that Ashley opened the back door and said "come with me, we got to see what's going on." Wright testified that he approached Evans, Anderson, Tommy, and Amanda in the parking lot; he stood behind Tommy "to see what was going on, because [he] didn't want to get into the mix." According to Wright, "that's when [Evans] stopped talking to Tommy * * * and * * * tried to start coming after me and * * * intimidating me in a way"; Evans said, "you're all trying to jump me, or something like that. * * * And he said, hold on here a second, and that's when he had went like this, put his hand in his pocket, and walked up to me. And he was about * * * nose to nose with me and was like, * * * I've got the renegades to come up here and put you down."

{¶ 30} Wright testified that he was scared and that, "when spit's coming in your

face from somebody else, they're too close."  Evans's hand was "fidgeting in his pocket" and someone yelled, "he has a knife."  Then Wright punched Evans and ran back to the car.  Wright testified that he is left-handed and punched Evans with his left hand, and that Evans "fell straight back" and "was perfectly fine."  According to Wright, he observed Evans sitting up on the ground, and he "didn't even look like he was messed up."  When asked what he intended to do in hitting Evans, Wright responded, "I felt like if I pushed him, * * * if he did have a knife * * * he could have gutted me in my stomach; I didn't want that to happen."  Wright recounted that "the same stuff" (a bar fight) had happened in 2000 with his uncle, who ended up paralyzed and later died.  Wright testified that he was "in fear for my life, and others," and "didn't want to end up like how [his] uncle did, or anybody else end up hurt."  Wight testified, "I did what I had to do to get out of there."

{¶ 31}  Wright testified that, as the Jeep left the scene, he heard Tommy say, "we just beat his ass."  From the rearview mirror, Tommy then observed Evans stopping a police officer, and Tommy told Wright, "get out and you're on your own; figure it out."  Wright responded, "what am I supposed to do?  I don't know what to do, I'm drunk."  Tommy and Ashley "took off," and Wright walked to his dad's house.

{¶ 32} Wright testified that he did not observe Tommy do anything to Evans, and that he told a detective "the whole story that happened," including that Evans had threatened him and that he was "scared for his life."  Wright testified that he did not have any fighting experience or training.  He testified that, in striking Evans, he used "basically enough force to knock him back" so he (Wright) could get away.  Wright testified that he did not kick or punch Evans while he was on the ground.  Wright testified that he was six feet tall "with shoes," and weighed 160-65 pounds.  Wright testified that he did not

anticipate that his punch could have caused Evans's injuries, and that he did not believe he had caused them. Wright stated that he had been honest in admitting his involvement to Via and that he had not wanted to get Tommy in trouble.

{¶ 33} On cross-examination, Wright testified that while he was sitting after asking Amanda to take his place in the pool game, he overheard Amanda whisper to Tommy, "that's the person that hit me in the face." He testified that he had not previously known what Evans did to Amanda. He stated that, when he ran back to the Jeep after hitting Evans, and "looked back, they was all in a circle around [Evans]. So * * * they could have been stomping his head in and I couldn't of seen it."

{¶ 34} At the conclusion of the testimony, the following exchange occurred:

[DEFENSE COUNSEL]: * * * The defendant is requesting that this Court provide a jury with instructions on the lesser offense of aggravated assault as well misdemeanor assault. And with regard to misdemeanor assault we believe that the jury could conclude that Mr. Wright either knowingly caused or attempted to cause just physical harm or that he may have recklessly caused serious physical harm which would make it a misdemeanor of the first degree. * * *

* * *

Your Honor, we're asking for the instruction on aggravated assault based on my client's testimony that the victim had gotten in his face; threatened him. He was in fear for his life at the time. He was upset and the victim was spitting in his face and my client, acting in the heat of the passion, punched the victim. * * *

* * *

THE COURT: There was no sudden rage or passion that anybody testified to which is required for aggravated assault and so that's overruled. Simple assault, the request is also overruled based upon the Court's finding in *State v. Underwood*[, 2d Dist. Montgomery No. 26711, 2016-Ohio-1101]. * * *

* * *

* * * In this case there is evidence that the - - no evidence that the defendant acted recklessly and there is evidence that the act caused serious physical harm. * * *

{¶ 35} The court instructed the jury on complicity, over Wright's objection, and on affirmative defense of self-defense, over the State's objection.

{¶ 36} The jury found Wright guilty of felonious assault (serious physical harm) as charged in the indictment, and he was sentenced to two years in prison.

{¶ 37} Wright asserts two assignments of error on appeal. His first assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO GIVE A JURY INSTRUCTION ON THE LESSER INCLUDED OFFENSE[S] OF ASSAULT AND AGGRAVATED ASSAULT.

{¶ 38} Wright asserts that, if the jury been instructed on assault, it might have found that he did not cause serious physical harm knowingly but caused it recklessly, under R.C. 2903.13(B), which defines assault. Therefore, he claims that the trial court erred when it relied on *Underwood*, which involved R.C. 2903.13(A) rather than (B), in

determining that an instruction on assault was not proper.  Similarly, Wright asserts that the trial court's refusal to give a lesser-included offense instruction on aggravated assault was erroneous, because the elements of felonious assault are identical to the elements of aggravated assault, except that aggravated assault has an additional mitigating element.  Wright argues that he presented evidence that Evans had threatened him with bodily harm "while he was so close that he was spitting on him," and a jury could have concluded that Evans's provocation "was enough to arouse [Wright's] passions * * * beyond his power of his control."  Wright asserts that the facts in this case are analogous to those in *State v. McCleod*, 7th Dist. Jefferson No. 00 JE 8, 2001 WL 1647305.

{¶ 39} The State responds as follows:

* * * Wright admitted to intentionally punching Evans in the face. The testimony established that Wright was nearly five inches taller than Evans and several pounds heavier.  Additionally, Wright testified to having consumed a significant amount of alcohol that night, * * * as well as being angry at Evans for his alleged encounter with Amanda.  Based upon all the evidence, the jury could find that the serious physical harm suffered was a reasonable consequence of Wright's assault.  Because the issue of Wright's intent to punch Evans was not contested, the jury could not reasonably find that Wright acted recklessly.  Thus, he was not entitled to the instruction on simple assault.

While Wright also requested an instruction on assault under R.C. 2903.13(A), the trial court correctly denied this request as well.  The difference between felonious assault and misdemeanor assault under

subsection (A) is whether the harm is serious or not. While Wright's defense throughout the trial was self-defense and he wasn't the one who caused all the harm to Evans, he did not deny that Evans suffered serious injuries.

{¶ 40} Regarding an instruction on aggravated assault, the State notes that "Wright never testified to any fit of rage or passion, only that he was scared of Evans and the threats he was making.   Simply being scared is not enough to establish the required provocation."   The State asserts that Evans testified that he never yelled at anyone and was backing away while being confronted by the group; his testimony was corroborated by Anderson's testimony that "Evans did not yell or threaten anyone."

{¶ 41} R.C. 2903.11 proscribes felonious assault and provides: "(A) No person shall knowingly * * * (1) Cause serious physical harm to another * * *."

{¶ 42} R.C. 2903.12 proscribes aggravated assault and provides: "(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly: (1) Cause serious physical harm to another * * *."

{¶ 43} R.C. 2903.13 proscribes assault and provides: "(A) No person shall knowingly cause or attempt to cause physical harm to another * * *. (B) No person shall recklessly cause serious physical harm to another * * *."

{¶ 44} R.C. 2901.22 provides in relevant part:

(B) A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances

when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

(C) A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 45} R.C. 2901.01(A)(3) defines physical harm to persons as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

{¶ 46} R.C.2901.01(A)(5) defines serious physical harm in part as follows:

* * *

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or

intractable pain.

{¶ 47} In *Underwood*, 2d Dist. Montgomery No. 26711, 2016-Ohio-1101, upon which the trial court relied, this court observed:

> The only difference between Felonious Assault under R.C. 2903.11(A)(1), and misdemeanor Assault under R.C. 2903.13(A), is whether the harm caused was *serious* physical harm, as opposed to non-serious physical harm. The difference between Felonious Assault under R.C. 2903.11(A)(1), and misdemeanor Assault under R.C. 2903.13(B) is the culpable mental state – for Felonious Assault the evidence must establish that the defendant acted knowingly, but for a simple Assault the evidence need only prove that the defendant acted recklessly. Both offenses require that the act caused serious physical harm.

*Id*. at ¶ 17.

{¶ 48} In *McCleod*, 7th Dist. Jefferson No. 00 JE 8, 2001 WL 1647305, to which Wright directs our attention, a dispute arose after McCleod attempted to return a keyless remote control transmitter he had purchased, and the store manager told him that he had to send it to the manufacturer for repair. *Id*. at *1. McCleod left the store, but later returned, which is when the assault occurred. *Id.* McCleod admitted to punching the victim once in the face, and the victim testified that McCleod also kicked him after he fell down and "provoked him by using a racial epithet." *Id.* The victim's treating physician testified that he suffered "facial bruising, bleeding, swelling, and a nondisplaced fracture of the orbital floor." *Id.* On appeal, McCleod argued that the court had erred in failing to instruct the jury on aggravated assault and the lesser included offense of assault. *Id.*

McCleod was convicted of felonious assault. *Id.*

{¶ 49} The Seventh District noted that aggravated assault is an inferior degree offense of felonious assault, "except for the additional mitigating element of passion or rage." *McCleod* at *2, citing *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph four of syllabus. The Seventh District determined that, in a trial regarding felonious assault, "where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury." *Id.*, citing *Deem*. The Court noted that *Deem* defined serious provocation as follows:

Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time. * * *

*Id.*, quoting *Deem* at paragraph five of syllabus.

{¶ 50} The Seventh District further noted:

Simple assault is a lesser included offense of felonious assault. *State v. Hartman* (1998), 130 Ohio App.3d 645, 647. "[A jury] charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, paragraph two of syllabus.

*Id.* at *3.

**{¶ 51}** The Court noted that the only evidence to support a conclusion that McCleod was provoked by a sudden rage or passion was McCleod's testimony that the victim used the racial epithet "n*****." *Id.* It was significant to the Court that "[g]enerally, words alone, even racially charged words, will not constitute sufficient provocation to incite the use of deadly force. * * *." *Id.* The Court noted that the record did not contain any other evidence sufficient to create a jury question on the issue of provocation, and "[b]ecause there [was] insufficient evidence to raise the issue of provocation, the trial court properly refused to instruct the jury on aggravated assault."

**{¶ 52}** Regarding simple assault, the court noted as follows:

> The circumstances are quite different, though, as far as the need to instruct the jury on simple assault. The instruction would be warranted if the jury could reasonably find that Appellant recklessly, rather than knowingly, caused serious physical harm; or that he knowingly caused or attempted to cause mere physical harm, rather than serious physical harm.

*Id.*

**{¶ 53}** The Seventh District concluded as follows:

> A reasonable jury could have acquitted Appellant of felonious assault because it is not clear that he was aware that one punch, and possibly a kick, would certainly or likely result in the type of serious injury which occurred. Appellant's "sucker punch," as it was described in testimony * * *, appears to be more likely an act of recklessness, which is an element of simple assault rather than felonious assault. See *State v. McFadden*

(Nov. 21, 1995), Franklin App. No. 95APA03-384, unreported (single, blind-side punch to head which caused victim's death was treated as reckless act in trial for felonious assault). Because the evidence could reasonably support a conviction for either felonious assault or simple assault, the trial court was required to instruct the jury on the lesser included offense of simple assault.

The Court reversed McCleod's conviction.

**{¶ 54}** As this Court has noted:

A trial court's decision to give or to withhold particular jury instructions is reviewed for an abuse of discretion. *State v. Pendleton*, 2d Dist. Clark No. 2017-CA-17, 2018-Ohio-3199, ¶ 44, citing *State v. Underwood*, 2d Dist. Montgomery No. 26711, 2016-Ohio-1101, ¶ 9. The facts and circumstances of the case are relevant in determining whether a trial court abused its discretion in giving a particular instruction. *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 30, citing *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 65. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Id.*, citing *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "An abuse of discretion includes a situation in which the trial court did not engage in a 'sound reasoning process.' " *Id.*, quoting *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14; *see also Underwood* at ¶ 9 (abuse of discretion includes decisions that are "grossly unsound, unreasonable, illegal, or

unsupported by the evidence").

*State v. Gibson*, 2d Dist. Clark No. 2018-CA-36, 2019-Ohio-1022, ¶ 22.

**{¶ 55}** We conclude that the trial court did not abuse its discretion in instructing the jury herein. We initially find that the testimony of Evans and Dr. Monto regarding the extent of Evans's injuries and enduring pain established that Evans suffered serious physical harm as a result of being punched by Wright, and not non-serious physical harm.

**{¶ 56}** We agree with the trial court that no one testified about the existence of the type of sudden rage or passion which is required for aggravated assault. Wright approached a confrontation between Tommy and Evans, to which he was not a party. Wright was not acquainted with Evans. While Wright testified that Evans threatened to have a biker gang come to Evans's defense, as Detective Via testified, "obviously those people were nowhere around and were not there that evening." Tommy and Wright outnumbered Evans. While Wright testified that he was in fear for his life and for others, "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998). Based upon the foregoing, and in the absence of evidence of sudden passion or a sudden fit of rage, the trial court did not abuse its discretion in failing to instruct the jury on aggravated assault.

**{¶ 57}** Regarding an instruction on assault in violation of R.C. 2903.13(B), we cannot find that the evidence could have supported a conclusion that Wright acted recklessly in assaulting Evans. *McCleod* is distinguishable, in that McCleod was directly angry at his victim and punched him in an immediate manner in the course of their dispute. There was no discussion of the size of the men in *McCleod*, but Evans was substantially

smaller than Wright in height and weight. Wright was also 20 years Evans's junior. Wright and Evans were strangers and, as noted above, the evidence was clear that Tommy's confrontation of Evans did not involve Wright. Rather than remaining in the Jeep, Wright, who testified that he was drunk, exited the vehicle and approached the confrontation. Wright testified that he punched Evans intentionally with his dominant hand. Evans testified that he was pleading his innocence to Tommy at the time. The evidence clearly shows a causal connection between Wright's conduct and Evans's injury, and Monto testified that the extent of Evans's injury was consistent with blunt force from a closed-fist punch. Under these circumstances, we conclude that Wright acted knowingly in deliberately exiting the Jeep, and in approaching and assaulting Evans, whom he did not know. The trial court did not abuse its discretion in instructing the jury only on felonious assault. This conclusion is supported by our analysis of Wright's assertion of the defense of self-defense, as discussed below, in that Wright cannot have it both ways: arguing that he acted recklessly by leaving the Jeep, approaching Evans, and assaulting him, but that he was not at fault in creating the violent situation and had a bona fide belief that he was in imminent danger of bodily harm.

{¶ 58} Based upon the foregoing, Wright's first assignment of error is overruled.

{¶ 59} Wright's second assignment of error is as follows:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO CONVICT THE DEFENDANT AND HIS CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 60} According to Wright, the testimony of Evans established that not only was Evans punched by Wright, but he also sustained multiple kicks from others while on the

ground.   Wright argues that it "was clear from Tommy's testimony that he wanted to assault Evans for revenge," but he was limited in what he could do because he had just had both arms removed from casts.   According to Wright, Evans testified that Tommy kicked him many times, and that Amanda testified that she observed Tommy attempt to kick Evans while he was on the ground.   Wright also asserts that, when Tommy returned to the car, he stated they had just "beat his ass," referring to Evans.   Wright argues that this evidence showed that the others, particularly Tommy, caused Evans's serious injury.

{¶ 61} Moreover, Wright asserts that the evidence did not show that the he had aided and abetted Tommy in injuring Evans.   According to Wright, the "evidence did not prove that [he] encouraged or supported Tommy"; rather, Wright defended himself and then removed himself from Evans.   Wright asserts that the injuries caused by Tommy and the others happened after he left Evans, and there was no evidence that he involved himself in any way with what they did.

{¶ 62} Finally, Wright argues that the jury lost its way in finding him guilty, because the evidence proved he acted in self-defense.   Wright asserts that he and Amanda both testified that when Wright approached Evans, Evans left Tommy and "got in [Wright's face," Evans made threats to bring a biker gang to "put him down," and Evans made similar threats to Tommy and Amanda.   According to Wright, Tommy and Amanda testified that Wright "looked scared during his encounter with Evans."   Wright argues that he, Amanda, Tommy all testified that someone had yelled that Evans had a knife, and only then did Wright punch Evans one time.   Wright asserts that "fear of Evans cutting him, something that had happened to his uncle, was the sole reason he used force," and he retreated to the Jeep immediately thereafter.   Wright asserts that he was not at fault

in creating the situation that led to his punch, because Evans and Tommy were already arguing when he approached, and that he had "a bona fide belief that he was in imminent danger of bodily harm" and that he "had no time to remove himself" without using force.

**{¶ 63}** The State responds that, while Evans "was unable to state who kicked him, he stated he was positive that Wright was the individual who punched him." The State notes that Anderson testified that Wright was the only person to strike Evans and that, although Tommy had tried to kick Evans, he had missed. The State points out that the only person who testified about an additional assault was Evans himself, who testified that he could not tell who was kicking him. Further, Dr. Monto testified that, based upon his training and experience, the injuries suffered by Evans could have been caused by a single closed fist hit to the face. According to the State, "it was reasonable for the jury to believe that the injuries were cause[d] solely by Wright's punch."

**{¶ 64}** The State asserts:

> * * * Wright's own testimony shows that he was acting to assist or support another, namely Tommy, when he punched Evans. Tommy, Amanda, and Wright all testified that Tommy was angry at Evans, and wanted to engage him for what Evans allegedly did to Amanda a month prior. However, all three agreed, Tommy couldn't do anything because he had just had surgery on both elbows, and had limited movement of his arms. Wright admitted to knowing this, and even testified that he went up to the group after he noticed Tommy and Evans arguing. Based upon the evidence, it is reasonable that the jury could find that Wright acted as an aider and abettor when he struck Evans.

Were the jury to find that Wright acted as an aider and abettor, instead of a principal offender, that decision was supported by Wright's testimony about joining the argument, thinking Tommy was about to get into a fight. Regardless of what occurred after the assault, the jury could have reasonably found that Wright joined the group and punched Evans with the goal of helping Tommy fight Evans.

{¶ 65} Finally, the State asserts that Wright's assertion of self-defense failed by way of his own testimony: Wright testified that he was already in the Jeep when Tommy and Evans began arguing, and Wright observed this argument and got out of the Jeep and ran up to the group. The State asserts that, regardless of whether the jury believed that Evans began to yell and threaten Wright, no one testified that Wright was backed into a corner or prevented from leaving. According to the State, Wright's "own testimony showed that he ran up to the group voluntarily, and after punching Evans, left and returned to the Jeep under his own power. This shows * * * that had Wright truly been fearful of imminent harm, he violated his duty to retreat and was not prevented from doing so by Evans."

{¶ 66} The State argues that the self-defense argument "came down to issues of credibility for the jury": based on the testimony presented, the jury could have reasonably found that Wright initiated the confrontation, that he could have retreated prior to the assault, and that he had not been not in fear of imminent danger. Therefore, the jury could have reasonably found that Wright's self-defense claim was not credible.

{¶ 67} This Court has previously noted:

When a conviction is challenged as being against the weight of the

evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In a manifest-weight analysis, the credibility of the witnesses and the weight to be given to their testimony are primarily for the trier of fac[t] to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that a substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 477684, *5 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). * * *

*State v. Nelson*, 2d Dist. Greene No. 2014-CA-7, 2015-Ohio-113, ¶ 29.

{¶ 68} Regarding the sufficiency of the evidence, this Court has previously stated:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, "the relevant inquiry is whether any rational finder of fact, after viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A guilty verdict will not be disturbed on appeal unless, "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

*State v. Wilson*, 2d Dist. Montgomery No. 27001, 2016-Ohio-7329, ¶ 6.

**{¶ 69}** As the State asserts, Wright "argues three specific instances where he claims the evidence did not support the verdict." Wright argues that the evidence does not support the identification of Wright as Evans's assailant, that the evidence does not support a "finding that he aided and abetted Tommy in assaulting Evans," and "that the jury lost its way by not accepting his assertion of self-defense."

### I. Identity

**{¶ 70}** Evans clearly identified Wright as his assailant. He testified that after falling to the ground upon the impact of Wright's punch, he covered his face with his hands and "received a couple kicks." We conclude that Wright mischaracterizes the record

when he asserts that "Evans testified that Tommy * * * kicked him many times." This conclusion is supported by Anderson's testimony that she observed Tommy try to kick Evans and miss before the group departed the scene. Detective Via testified that he developed Wright as a suspect after speaking to Evans, and the version of events that Wright related to Via in the course of his interview, as testified to by Via, was consistent with Evans's testimony that Tommy initially confronted him, and Wright approached Evans and hit him one time in the face. We conclude that the identification of Wright as Evans's assailant was supported by sufficient evidence and was not against the manifest weight of the evidence.

## II. Complicity

{¶ 71} R.C. 2923.03, the complicity statute, provides: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense."

{¶ 72} As this Court has noted

R.C. 2923.03 provides that a defendant who joins with another to commit an offense may be charged as a principal offender. *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 21; *see also State v. Hancher*, 2d Dist. Montgomery No. 23515, 2010-Ohio-2507, ¶ 5, citing R.C. 2923.03(F). ("A person who is complicit in an offense may be charged and punished as if he were the principal offender, and a charge of complicity may be stated * * * in terms of the principal offense."). " 'To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported,

assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *Hancher* at ¶ 5, quoting *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001); *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 27. The requisite criminal intent may be inferred from the circumstances of the crime, *id.*, including from "presence, companionship and conduct before and after the offense is committed." *Grissom* at ¶ 21, quoting *Johnson* at 245. "An aider and abettor is 'punished as if he were a principal offender.' " *Id.*, quoting R.C. 2923.03(F).

*State v. Koch*, 2d Dist. Montgomery No. 28041, 2019-Ohio-4182, ¶ 43.

**{¶ 73}** We further find that a reasonable juror could have concluded that Wright acted to support, assist, or encourage Tommy, his friend and companion. Wright testified that while in the Jeep, he heard yelling, and Ashley advised him that "Tommy's about to get into a fight." As discussed above, Wright, who did not know Evans, testified that he left the Jeep and approached the confrontation that Tommy began with Evans, ultimately punching Evans before fleeing with Tommy in the Jeep. As the State asserts, were "the jury to find that Wright acted as an aider and abettor, instead of a principle offender, that decision was supported by Wright's testimony about joining the argument, thinking Tommy was about to get into a fight." We conclude that Wright's conviction, whether as the principal offender or an aider and abettor, was supported by sufficient evidence and was not against the manifest weight of the evidence.

III. Self-defense

{¶ 74} As this Court has previously noted:

> * * * " 'Self-defense is an affirmative defense, which means that the burden of going forward is on the defendant who must prove each element by a preponderance of the evidence.' " *State v. Oates*, 2013-Ohio-2609, 993 N.E.2d 846, ¶ 10 (3d Dist.), quoting *State v.Kimmell*, 3d Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 19. (Other citations omitted.) "Affirmative defenses such as self-defense ' "do not seek to negate any elements of the offense which the State is required to prove" but rather they "admit[ ] the facts claimed by the prosecution and then rel[y] on independent facts or circumstances which the defendant claims exempt him from liability." ' " *Id.* at ¶ 10, quoting *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 32, , quoting *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986).
>
> To establish self-defense, a defendant must introduce evidence showing that: (1) he was not at fault in creating the violent situation; (2) he had a bona fide belief that he was in imminent danger of bodily harm; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997), citing *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). (Other citation omitted.) Therefore, "[t]o support a claim for self-defense, a defendant must demonstrate that he acted out of fear, or he felt that his life was threatened." *State v. Crawford*, 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 26. In instances where less than deadly force is used, the defendant need only show a fear of bodily harm, not of death or great bodily harm. *State v. Gee*,

2d Dist. Miami No. 87-CA-22, 1987 WL 20260, *2 (Nov. 17, 1987); *State v.*

*Perez*, 72 Ohio App.3d 468, 594 N.E.2d 1041 (10th Dist. 1991).

*State v. Brown,* 2017-Ohio-7424, 96 N.E.3d 1128, ¶ 23-24 (2d Dist.).[2]

{¶ 75} Finally, we agree with the State that "Wright's assertion of self-defense failed by way of his own testimony." In other words, construing the evidence in a light most favorable to the State, we conclude that Wright failed to establish independent facts or circumstances which exempt him from liability. As noted above, Wright was in the Jeep when Tommy confronted Evans, whom Wright did not know. Evans's testimony was consistent with the version of events related by Wright to Detective Via, that Wright punched him in the face. Wright was younger and substantially heavier and taller than Evans. Given their difference in size, and the fact that Evans was outnumbered two to one by Tommy and Wright, we conclude that the jury could have reasonably discredited Wright's testimony that Evans stood "nose to nose with me" in an intimidating manner causing Wright to fear for his life. The jury clearly credited Evans's testimony, and we defer to the jury's assessment of credibility. Evans testified that he was not armed, that he did not imply that he had a weapon, and that he pled his innocence to Tommy. Via testified that Wright told him that Evans "had made no advances toward him," and that Wright "was very clear to me that he did not see a weapon." We find that the jury could have reasonably concluded that Wright was at fault in creating the violent situation by leaving the Jeep, approaching Evans, and punching him, and that he did not have a bona

---

[2] We note that Am.Sub.H.B. 228, which was effective on March 28, 2019, amended R.C. 2901.05(B)(1), switching the burden of proof with respect to a claim of self-defense from the defendant to the State. At the time of Wright's trial, the burden of proof with respect to a claim of self-defense was on the defendant.

fide belief that he was in imminent danger of bodily harm under these circumstances. We further agree with the State that "the jury could reasonably find, that had Wright truly been fearful of imminent harm, he violated his duty to retreat and was not prevented from doing so by Evans."

{¶ 76} Having reviewed the entire record, construing the evidence in a light most favorable to the State, and deferring to the jury's clear assessment of credibility, we conclude that Wright's conviction for felonious assault was supported by sufficient evidence and was not against the manifest weigh of the evidence.  Wright's second assignment of error is overruled.

{¶ 77} The judgment of the trial court is affirmed.

. . . . . . . . . . . .


FROELICH, J. and HALL, J., concur.




Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen
William O. Cass, Jr.
Hon. Gregory F. Singer