[Cite as *State v. Hodge*, 2022-Ohio-1780.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29147 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-3741 |
| | : | |
| ALFRED HODGE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of May, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
　　Attorney for Plaintiff-Appellee

CHARLES M. BLUE, Atty. Reg. No. 0074329, 401 East Stroop Road, Kettering, Ohio 45429
　　Attorney for Defendant-Appellant

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Alfred Hodge appeals from his convictions on one count of felonious assault and one count of domestic violence. Based on our review of the record, we conclude that the trial court abused its discretion when it denied Hodge's request for a jury instruction on self-defense. Therefore, we will reverse Hodge's convictions and remand this cause to the trial court for further proceedings consistent with this opinion.

I.       Facts and Course of Proceedings

{¶ 2} Annette Houston and Hodge met in in 2018 while working at the Stillwater Center. May 10-11, 2021 Trial Tr., p. 18, 134. By February 2019, Hodge and Houston were engaged. *Id.* at 135-136. They moved in together and shared expenses at an apartment on Woolery Lane in Clayton, Ohio. *Id.* at 19-20, 136.

{¶ 3} On the evening of November 8, 2019, police officers were dispatched to the apartment on Woolery Lane in response to a 9-1-1 call placed by Houston. *Id.* at 28-29, 71-72. Both Hodge and Houston agreed that they had been involved in a heated argument with each other earlier that evening. But their stories diverged from that point.

{¶ 4} According to Houston, Hodge had started an argument over whether she was cheating on him. *Id.* at 22. As a result, she decided not to cook dinner and instead left to get food from McDonald's for herself. *Id.* at 24, 56-57. When she left the apartment, she noticed that Hodge was sitting at the kitchen table drinking beer. After returning to the apartment with her food from McDonald's, Houston went to the main bedroom and ate it. Then she fell asleep. *Id.* at 24, 60. At some point, she awoke to the sound of

the smoke alarm going off. *Id.* at 26. She went to the kitchen to see if anything was burning and did not notice anything. She returned to her bedroom and laid down. Hodge subsequently came in mumbling something and, as he approached the bed, Houston heard him say "If I can't have you, can't nobody have you." *Id.* at 27-28, 38. As she started to rise from the bed, Hodge poured a pot of hot grease on her. *Id.* at 65. She got up from the bed and tried to get to Hodge, but he left the apartment before she could reach him. Houston then called 9-1-1. At the time she placed the call, Houston assumed that the hot liquid poured on her was water. *Id.* at 28-29, 33.

{¶ 5} Sergeant Paul Nabel of the Clayton Police Department was the first officer to arrive at the apartment. He testified that when he entered the apartment there was smoke throughout and many beer bottles on the kitchen table. *Id.* at 73, 75, 78. Hodge's work identification card also was on the table. *Id.* at 78. There was grease residue throughout the apartment and a grease imprint of Houston's body in the bed. *Id.* at 75, 80, 84. Houston told Sergeant Nabel that Hodge had poured a pot of a hot substance on her while she was laying in her bed. *Id.* at 74. Nabel was unable to locate Hodge that evening. *Id.* at 81.

{¶ 6} Police Officer Bradley Campbell, who worked for the City of Clayton, was dispatched to the apartment on Woolery Lane after 10:00 p.m. on November 8, 2019. According to Officer Campbell, there were numerous beer bottles on the kitchen table, smoke throughout the apartment, and a black, charred substance on the hallway carpet and in the bedroom and bathroom. *Id.* at 94, 97-99. He checked the vicinity of the apartment several times over the next few days but could not locate Hodge. *Id.* at 100.

About two or three weeks after the incident, Officer Campbell entered the apartment and noticed that Hodge's work ID was no longer in the apartment.    *Id.* at 101.

{¶ 7} Hodge's version of the events varied greatly from Houston's version. According to Hodge, while Houston was at McDonalds, he drank a beer with his friend Wayne and made some french fries, which resulted in the smoke alarm going off.    *Id.* at 149, 158.    Hodge testified that almost all of the empty beer bottles on the table in their apartment were beers that Wayne had drank.    *Id.* at 149.    When Houston returned, Hodge and she began arguing again about whether she was cheating on him.    Houston told Hodge that she liked being with other men.    *Id.* at 141-142.    Hodge stated that he walked away from her and went into the main bedroom.    A few minutes later, Houston came into the room holding a pot.    *Id.* at 142, 158-159.    She sat the pot down on a small refrigerator.    Houston then picked it back up and said "I will burn your [expletive] and I will get away with it."    *Id.* at 143-145.    Houston then raised the pot to pour it onto Hodge, but Hodge raised his arm up to block the pot from being poured onto him.    According to Hodge, the block motion caused the pot to spill some liquid on his hands and some liquid on Houston's body.    *Id.* at 146-148.    Houston was not emotional at that moment and went into the bathroom.    *Id.* at 149.    Hodge left the apartment and did not return for several days.    Hodge testified that he was not aware at the time he left the apartment that Houston had suffered severe burns.    *Id.* at 151.

{¶ 8} A grand jury indicted Hodge on one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1), and one count of domestic violence, a fourth-degree felony in violation of R.C. 2919.25(A).    A jury found him guilty on both

counts.   The trial court sentenced Hodge to a minimum of six years to a maximum of nine years of imprisonment on the felonious assault count and 18 months imprisonment on the domestic violence count.   The sentences were to be served concurrently.   Hodge filed a timely notice of appeal from his convictions.

II.   The Trial Court Abused Its Discretion By Failing to Submit A Jury Instruction on Self-Defense

{¶ 9}   Hodge's first assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO CHARGE THE JURY

WITH AN INSTRUCTION PERTAINING TO SELF-DEFENSE.

{¶ 10}   "Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder."   *State v. Shine-Johnson*, 2018-Ohio-3347, 117 N.E.3d 986, ¶ 25 (10th Dist.). "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction."   *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240.   "[T]he trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction."   *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 72, citing *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989), paragraph two of the syllabus.   Accordingly, we must determine whether a trial court's refusal to submit to the jury a requested instruction

constituted "an abuse of discretion under the facts and circumstances of the case." *Wolons* at 68.

{¶ 11} The State contends that the trial court correctly denied Hodge's request for a jury instruction on self-defense. According to the State, "[s]elf defense is in the nature of confession and avoidance, where the accused admits that he engaged in the conduct but claims that he was legally justified to do so. * * * In this case, the criminal act alleged was that Hodge knowingly poured smoking hot grease on [Houston] and caused her serious physical harm. Hodge's testimony does not admit that he committed that act." State's Brief, p. 10. Hodge responds that "[b]locking the pot to prevent the grease from being thrown on him was a knowing act taken by [Hodge} with the purpose of defending himself. Although [Hodge] responded affirmatively to a single question asking if the action was reflex, the entirety of the testimony clearly demonstrated that [Hodge] knowingly took the action to prevent the grease from being thrown on him." Hodge's Brief, p. 12.

{¶ 12} R.C. 2901.05(B)(1) provides that a person is allowed to act in self-defense. If the person presents evidence that tends to support that he used force in self-defense, then the prosecution must prove beyond a reasonable doubt that the accused person did not use force in self-defense. *Id.* "To establish self-defense, a defendant must introduce evidence showing that: (1) he was not at fault in creating the violent situation; (2) he had a bona fide belief that he was in imminent danger of bodily harm; and (3) he did not violate any duty to retreat or avoid the danger." *State v. Brown*, 2017-Ohio-7424, 96 N.E.3d 1128, ¶ 24 (2d Dist.), citing *State v. Thomas*, 77 Ohio St.3d 323, 326, 673

N.E.2d 1339 (1997).

{¶ 13} Hodge's trial counsel requested a jury instruction on self-defense. Initially, the trial court granted this request. The trial court explained that *State v. Marbury*, 2d Dist. Montgomery No. 19226, 2004-Ohio-1817, appeared to be most closely related to the facts in the present case. The trial court stated, in part:

> So, I think we have a situation here where the claim by the defendant is that he was protecting himself in this alleged melee that occurred from something being dumped on him and as a result of him putting his arm up, the victim in this case was injured. So it more closely relates akin to *State v. Marbury* in this case. And so, based on that, I am going to allow the self-defense instruction, but obviously, note [the State's] objection to that in this case.

Trial Tr., p. 176.

{¶ 14} In *Marbury*, the defendant testified that he was walking toward a parked car when the occupant of the car pointed a gun at him. *Marbury* at ¶ 7. The defendant jumped into the car and began struggling with the occupant for control of the gun. During that struggle, the gun discharged. *Id.* The defendant was charged with felonious assault. The State argued that the defendant was not entitled to a self-defense jury instruction because the defendant claimed the gun accidentally went off and therefore his claim of accident negated his claim of self-defense. *Id.* at ¶ 15. We concluded:

> Implicit in the State's argument is a view that, because a person's use of force in self-defense is necessarily a purposeful act, force that occurs accidentally doesn't qualify for self-defense. We agree with that view. However, Defendant

didn't claim that he shot the victim in self-defense. Rather, he claims that he jumped into the victim's car to take his gun away in order to defend himself from being shot. The fact that the gun discharged accidentally in the course of that affray, as Defendant claims, does not negate his right to claim self-defense with respect to the force he used that led to the claimed accidental discharge.

*Id.* at ¶ 16.

{¶ 15} The trial court, however, revisited its decision to rely on *Marbury* after a brief recess during which the court reviewed Hodge's testimony. The trial court ultimately decided not to include an instruction on self-defense and provided the following reasoning in support of its decision:

[A]n individual defendant must present evidence that they * * * affirmatively committed an act to protect themselves.

In the testimony that was given, and what I reviewed over the lunch hour, Mr. Hodge did indicate that he acted in a reflexive manner. He testified that he did not try to hurt her. He testified that he did not - - when he was asked by [Defense Counsel] Mr. Wilder, did you use any force against her? He said no. He was asked by Mr. Wilder, did you try to hurt her? And he said no. He admitted he wasn't trying to hurt her or that he was trying to use any force against her. He admitted to touching the object. Mr. Wilder asked if he admitted to touching the object in her hand that she was threatening to put on him, and as a result, it caused the grease to hit her. He said, yes. He said he didn't throw the grease on her and he didn't intend to throw the grease on her.

And so the Court does agree with the State that a reflex is not an intentional act. And he had to have acted intentionally or used that actual force. So the question is, was the act of putting his hands up in a reflexive manner, per his testimony, to allegedly protect himself, an intentional or purposeful act for this use of non-deadly force to protect himself against this imminent harm he believed.

So I do not believe that that reflex qualifies as an intent. So the bottom line is, is putting our hands up in a reflexive manner is not intentional force or non-deadly force in the situation that was presented here. Is putting his hands up to repel the pan, as he testified, is not part of that self-defense, that intentional act, that outward affirmative act of non-deadly force to protect yourself from the imminent harm you believe that you're going to suffer.

So much like the example the State just gave, he didn't grab the pan himself, and use that to protect himself from it being thrown on him or use another object against her. The reflexive manner of putting his arm up to protect himself goes really towards the element of knowingly, did he knowingly commit this act.

And so I'm reconsidering my previous decision and I am not going to give the instruction on self-defense as I had previously stated. * * *

But again, at the end of the day, the testimony provided by Mr. Hodge of he put his hands up in a reflex, that he did not try to hurt her, that he was not using any force against her, that he did not throw the grease on her, and that he did not intend to put any of the grease on her, this Court's opinion is that that was not the intentional force that would be needed for self-defense instruction.

*Id.* at 189-191.

{¶ 16} Hodge was asked several questions about the physical force he exerted that led to Houston's severe burns. During questioning from his trial counsel, Hodge testified as follows:

Q: Explain that to us.

A: * * * We were arguing back and forth just moving, walking back and forth arguing. I went to the bedroom and she came back there. She didn't appreciate some of the words that I used and she had the pot in her hand. She said, you know I will blank throw this on you and I don't know who you think you are talking to, it was words like that. And - -

Q: You said the word blank, what do you mean?

A: Cuss words. Cuss words.

Q: Go ahead. Tell us what she said to you with the pot in her hand.

A: Okay. Get your [expletive], [expletive] I will throw this on your ass.

Q: And when she said that, what did she have in her hand?

A: She had the pot of grease at that point.

* * *

Q: What does she do with the pot, if anything, at any point with it?

A: At first she was yelling there, what that picture is, that's actually a little refrigerator that setting there. She set [the pot] there on that refrigerator for just a moment * * * .

* * *

Q: And what does she do, what does she say to you?

A: * * * And that's when she picked [the pot] back up and she did a motion, and I did a block motion like that (indicating) and that's when the grease spilled to her.

Q: Did she say anything before she moved the pot of grease towards you?

A: She said I will burn your [expletive] and I will get away with it.

* * *

Q: The first thing I want you to explain to the jury is what Annette is doing when she -- from the time she picks the pot up off the fridge until you make your motion. Explain to us what Annette is doing, show us.

A: Okay. She's holding and she has [the pot] at a certain level, and then as she's still arguing with me, we're exchanging words, and then at this point when she says, you know, I will burn your [expletive], then she went up with the up motion, and I did like that.

Q: Okay. So you did like that, you got your arm above your chest moving it forward?

Yes, to block.

Q: What - -

A: To keep from it - -

Q: Oh, go ahead.

A: To keep from it, you know, spilling all on me. I just did a block motion to basically a self-defense mode to just stop it from falling on me.

\* \* \*

Q: Were you in fear that you were going to have grease dumped on you?

A: Yeah, it was a fearful moment and then I - - I was just really dazzled that all this was actually taking place because I didn't quite understand it all. It was just a little bit more frightening, it was a little scary, and I just didn't know why come it couldn't have been done a little bit more like adults would do it.

*Id.* at 142-147.

During cross-examination by the State, Hodge provided the following additional testimony regarding the motion he made to block the pot:

Q: Did she follow you directly into the bedroom with that pot of oil?

A: Not exactly right away.

\* \* \*

Q: And five minutes or so later she came down to the bedroom?

A: Yeah, and we was still having whatever back and forth, yes.

\* \* \*

Q: Is that when she picked up the pot and threw it on you, when you were getting the cold cuts?

A: Actually, I turned back around. I was right along in that area here (indicating) - -

Q: Okay.

A: - - because I turned and walked away and we was still dong [sic] that word thing. And that's when things just kind of absolutely went the wrong

way.

Q: So you were walking away, and then you turned around to face her again?

A: Yes.

Q: And that's when she had the pot here, she raised it up - -

A: Yeah.

Q: - - she tried to throw it on you, and you blocked it?

A: Right.

Q: You threw your hands up in reflex?

A: Yeah, it was like a motional, a block motion.

Q: Okay.   And you didn't throw the grease on her?

A: No, I did not.

Q: You didn't - - your version is that you didn't try to hurt her?

A: No, I did not.   No, I didn't.

Q: You didn't use any force against her to try to hurt her.

A: No.   I did not.

*Id.* at 158-165.

{¶ 17} On re-direct and re-cross, Hodge concluded his testimony about blocking the pot:

Q: You were asked about any force that you used against her.   If you had not had your arm up, as you explained to us, what would have happened?

A: It would have gotten on me.

Q: What would have gotten on you?

A: The grease would have gotten on me.

Q: And how would it have gotten on you? Who was going to cause that to you?

A: Annette was going to cause that to happen to me.

Q: All right. And just so we're all clear, you used your arm to hit that pot, correct?

A: Yes.

Q: So you didn't actually touch Annette, but you touched the object that she had in her hand that she was threatening to put on you, correct?

A: It was the pot on me.

Q: And as a result of that action, did that cause the grease to hit her?

A: Yes.

Q: When Annette had that pot in her hand, was she mad?

A: Yeah, she was pretty angry.

Q: Okay. Who brought that pot into the bedroom?

A: Annette brought it in.

Q: Who threatened to use that pot of grease on the other person?

A: Annette.

Q: Did you ever throw grease on her that night?

A: No, I didn't.

* * *

Q: When you put your arm up to block the grease, did you intend to get grease on Annette?

A: Never would I do something like that.

*Id.* at 171-172.

{¶ 18} Based on its review of Hodge's testimony, the trial court found that Hodge's blocking motion was an involuntary reflex; therefore, he did not commit an intentional act when he raised his arm and used force to block the pot. As a result, the trial court found that Hodge's testimony did not support an argument of self-defense. We believe this was an unreasonable interpretation of Hodge's testimony.

{¶ 19} Hodge testified that he intentionally raised his arm in order to block the pot from being poured on him immediately after Houston stated that she was going to burn him. This was not a reflex or an involuntary act. "Reflex" is defined as "an automatic and often inborn response to a stimulus that involves a nerve impulse passing inward from a receptor to a nerve center and thence outward to an effector (as a muscle or gland) without reaching the level of consciousness." *Merriam Webster's Collegiate Dictionary* 1046 (11th Ed.2014). For example, a sneeze or a hiccup are examples of reflexes.

{¶ 20} Further, R.C. 2901.21(F)(2) provides that "[r]eflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition, are involuntary acts." Hodge's testimony does not support a finding that he committed an involuntary act. Rather, Hodge's testimony describes a voluntary, intentional act to block an object coming at him. If his testimony were believed, Hodge made a quick, almost instantaneous decision to raise his arm to

block a pot immediately after being told by Houston that she was going to burn him. While the decision may have occurred in the spur of a moment, his testimony does not support the notion that Hodge failed to make a voluntary movement or did not intend to make a blocking motion to hit the pot. Rather, Hodge testified clearly that he meant to block the pot when he raised his arm. While his decision and action were swift, they were neither involuntary nor a reflex.

{¶ 21} Without a self-defense instruction before it, the jury had no choice but to make a finding of guilt even if the jury believed all of Hodge's testimony, because Hodge testified that he intentionally used force to block a pot, which caused the pot to then pour hot grease onto Houston. In other words, he knowingly used force that caused physical harm to another, which was what was required to convict him on the counts of felonious assault and domestic violence. R.C. 2903.11(A)(1) and R.C. 2919.25(A). The trial court's failure to include a jury instruction on self-defense prevented the jury from considering Hodge's affirmative defense and relieved the State of its burden to prove beyond a reasonable doubt that Hodge did not use the force in self-defense. R.C. 2901.05(B)(1). While the jury ultimately may have believed Houston's version of events over Hodge's version of events, we cannot make that assumption given that the absence of the self-defense instruction made Hodge legally culpable under either version of events.

{¶ 22} The trial court abused its discretion when it denied Hodge's request for a jury instruction on self-defense. Hodge's first assignment of error is sustained.

III.    The Trial Court Did Not Commit Plain Error When It Did Not Include a Jury Instruction Relating to the Defense of Accident

{¶ 23}   Hodge's second assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO CHARGE THE JURY WITH AN INSTRUCTION PERTAINING TO ACCIDENT.

{¶ 24} Hodge contends that the trial court should have included an instruction to the jury relating to the defense of accident.   Hodge concedes that his trial counsel did not request a jury instruction related to this defense.   Therefore, our review of the trial court's decision to not include this jury instruction must be limited to plain error under Crim.R. 52(B).   *See State v. Holley*, 11th Dist. Ashtabula No. 98-A-0089, 1999 WL 1313667, *9-10 (Dec. 17, 1999), citing *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990).

{¶ 25} All evidence relevant to Hodge's defense presented at trial supported an instruction of self-defense rather than accident.   Hodge's own testimony described Houston as the aggressor and himself as the defender.   Moreover, his testimony was that he intentionally used physical force to make contact with the pot containing the hot grease.   Although his physical force applied to the pot led to injuries that he may not have intended, the physical force he applied to the pot was not administered by accident.   Therefore, the evidence presented at trial would not have supported a jury instruction relating to accident.   *State v. Collins*, 3d Dist. Allen No. 1-99-78, 2000-Ohio-1676, *2 (March 30, 2000).

{¶ 26} The Supreme Court has pointed out the inherent inconsistency between the theories of self-defense and accident.   In *State v. Champion*, 109 Ohio St. 281, 286-87,

142 N.E. 141 (1924), the Court stated:

> The very fact that requests were asked both on accidental homicide and self-defense, under the same evidence, presents a most peculiar paradox— a direct contradiction in terms and truth. Self-defense presumes intentional, willful use of force to repel force or to escape force. Accidental force or shooting is exactly the contrary, wholly unintentional and unwillful.

{¶ 27} In our resolution of Hodge's first assignment of error, we held that the trial court abused its discretion in failing to submit a self-defense instruction to the jury. Based on the trial testimony, it would have been inappropriate for the trial court to submit an accident instruction to the jury.

{¶ 28} Hodge's second assignment of error is overruled.

IV.     Hodge's Right to Remain Silent Was Not Violated at His Jury Trial

{¶ 29} Hodge's third assignment of error states:

> THE STATE'S CROSS-EXAMINATION OF APPELLANT REGARDING HIS POST-ARREST SILENCE VIOLATED HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT.

{¶ 30} In this assignment of error, Hodge contends that the State's questioning of Hodge on cross-examination about his decision to not tell the police what had happened "made no distinction between [Hodge's] pre-arrest and post-arrest silence." Hodge Brief, p. 16. According to Hodge, the State improperly elicited testimony from Hodge regarding his post-arrest silence in an attempt to impeach him, which was in violation of Hodge's

Fifth Amendment rights. *Id.* at 17-18. The State responds that "[c]ontrary to Hodge's argument, the questions by the prosecution in this were not a comment on his post-*Miranda* silence, but a test of the truthfulness of his claims based on his pre-arrest silence." State Brief, p. 16.

{¶ 31} The Ohio Supreme Court has cautioned against allowing the State to raise a defendant's pre-arrest silence as evidence of guilt in a jury trial. In *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 31, the Court explained:

> Allowing the use of pre-arrest silence, evidenced here by the pre-arrest invocation of the right to counsel, as substantive evidence of guilt in the state's case-in-chief undermines the very protections the Fifth Amendment was designed to provide. To hold otherwise would encourage improper police tactics, as officers would have reason to delay administering *Miranda* warnings so that they might use the defendant's pre-arrest silence to encourage the jury to infer guilt. * * * Use of pre-arrest silence in the state's case-in-chief would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence.

{¶ 32} That being said, the Court then clarified that the defendant's pre-arrest silence may be used for impeachment purposes:

> The use of pre-arrest silence for impeachment is distinguishable. When a defendant testifies at trial, the defendant has "cast aside his cloak of silence." * * * Thus, use of pre-arrest silence as impeachment evidence

is permitted because it furthers the truth-seeking process. Otherwise, a criminal defendant would be provided an opportunity to perjure himself at trial, and the state would be powerless to correct the record. But using a defendant's prior silence as substantive evidence of guilt actually lessens the prosecution's burden of proving each element of the crime and impairs the "sense of fair play" underlying the privilege.

(Citations omitted.) *Id.* at ¶ 33.

{¶ 33} During cross-examination, the State made the following inquiry into Hodge's pre-arrest silence:

Q: You didn't call the police and say, she tried to throw grease on me?

A: No, I did not.

Q: You never told the police what happened?

A: No, I did not.

Q: Did you know the police were looking for you?

A: No, I did not for a while. And - -

Q: So when you found out the police were looking for you did you go talk to them and tell them your side of the events?

* * *

A: When I did talk to them, I told them I needed - - I didn't feel so open to talk with them, I needed to have an attorney present.

Trial Tr. at 166-67.

{¶ 34} On re-direct examination, Hodge's counsel asked questions to clarify:

Q: Alfred, do you remember whenever you were confronted by law enforcement and asked whether or not you wanted to make any statements, do you remember where you were when they came to talk to you?

A: Ah, yes.   I was here.

Q: You were where?

* * *

A: Jail.

Q: Okay.   And did you want to talk to them?

A: No.

Q: Okay.   And in fact, you asserted your rights, did you not, and asked for an attorney first?

A: Yes, yes.   I did.

*Id.* at 170.

{¶ 35} Defendant testified that he was the defender and Houston was the aggressor in the situation that resulted in Houston's suffering serious burn injuries. Given Hodge's testimony, the State had some latitude to inquire into why he did not call the police about being attacked by Houston.   That inquiry would go directly toward impeachment of Hodge's credibility as to his version of events.   We acknowledge that the State must walk a very fine line anytime it delves into a defendant's pre-arrest silence during a jury trial.   Based on the record before us, however, we conclude that the State did not cross this line in its questioning of Hodge.

{¶ 36} Hodge's third assignment of error is overruled.

V.     Hodge Has Not Shown That He Received Ineffective Assistance of Counsel

{¶ 37} Hodge's fourth assignment of error states:

APPELLANT WAS PREJUDICED BY THE DENIAL OF HIS RIGHT TO EFFECIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

{¶ 38} In this assignment of error, Hodge contends that his trial counsel was ineffective when he 1) failed to request a jury instruction relating to accident after the trial court overruled his request for a self-defense instruction; and 2) failed to request a curative instruction after the State's cross-examination, "which commented on [Hodge's] post-arrest assertion of his Fifth Amendment right to remain silent."   Hodge's Brief, p. 19.

{¶ 39} To show that his trial counsel was ineffective, Hodge is required to prove that his counsel's performance fell below an objective standard of reasonable representation and that the deficiency prejudiced him.   *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 40} In our analysis of Hodge's second assignment of error, we held that a jury instruction on accident would not have been appropriate based on the testimony presented at trial by the defense.   Therefore, we cannot find that the decision by Hodge's defense counsel to not request an accident jury instruction was deficient or prejudicial.

{¶ 41} Further, our analysis of Hodge's third assignment of error concluded that

the State did not improperly delve into Hodge's silence. Therefore, defense counsel was not deficient in failing to request a curative instruction relating to testimony about Hodge's silence.

{¶ 42} Hodge's fourth assignment of error is overruled.

VI. The Trial Court Committed Plain Error By Failing to Merge Hodge's Two Felony Offenses

{¶ 43} Hodge's fifth assignment of error states:

THE TRIAL COURT ERRED BY CONVICTING APPELLANT OF ALLIED OFFENSES OF SIMILAR IMPORT.

{¶ 44} In this assignment of error, Hodge argues that his convictions for domestic violence and felonious assault were subject to merger pursuant to R.C. 2941.25. Initially, we note that Hodge concedes that he did not ask the trial court to merge the domestic violence offense with the felonious assault offense. Accordingly, Hodge has waived all but plain error on this argument. But a trial court's failure to merge allied offenses of similar import is plain error. *State v. King*, 2d Dist. Montgomery No. 29137, 2021-Ohio-422, ¶ 28.

{¶ 45} R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 46} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 30-31, the Ohio Supreme Court clarified the applicable standard with respect to the R.C. 2941.25 merger determination as follows:

Rather than compare the elements of the two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

{¶ 47} At trial, the State produced evidence that Hodge had poured hot grease on Houston on one occasion. Both the domestic violence and felonious assault convictions were based on this one physical act. In short, the conduct that formed the basis for the felonious assault charge also formed the basis for the domestic violence charge, the offenses were committed at the same moment, and the offenses were committed with the same animus. The answers to all three questions from *Ruff* would be negative and the offenses should have been merged for purposes of sentencing.

{¶ 48} The State does not argue in its brief that the offenses should not have been merged. Instead, the State contends that "[t]his Court has repeatedly held that a trial court's failure to merge two offenses for sentencing becomes moot when one of those sentences has been completely served." State's Brief, p. 22, citing *State v. Caudill*, 2d Dist. Montgomery No. 24881, 2012-Ohio-2230, ¶ 11, citing *State v. Smith*, 2d Dist. Montgomery No. 24404, 2012-Ohio-734, ¶ 26. According to the State, we should decline to correct the plain error and instead find that the issue is moot, because Hodge has served his entire sentence on his domestic violence conviction. We do not agree.

{¶ 49} The *Caudill* decision cited by the State involved a defendant who had served his entire sentence on a misdemeanor while the appeal was pending. Ordinarily, "[w]here a defendant, convicted of a criminal offense, has voluntarily paid the fine or completed the sentence for that offense, an appeal is moot when no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability or loss of civil rights from such judgment or conviction." *State v. Wilson*, 41 Ohio St.2d 236, 325 N.E.2d 236 (1975), syllabus. This general rule does not apply to

felony convictions, which result in collateral disabilities as a matter of law. *State v. Golston*, 71 Ohio St.3d 224, 643 N.E.2d 109 (1994), syllabus. Both offenses for which Hodge was convicted were felonies. Therefore, the fact that he has served his sentence on one of those two felonies does not render his allied offense argument moot.

{¶ 50} The trial court committed plain error in failing to merge the offenses of felonious assault and domestic violence. The fifth assignment of error is sustained.

VII.    Hodge's Sixth Assignment of Error is Moot

{¶ 51} Hodge's sixth assignment of error states:

THE CUMULATIVE EFFECT OF THE ERRORS SET FORTH HEREIN DEPRIVED APPELLANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

{¶ 52} Based on our disposition of the first assignment of error, Hodge's sixth assignment of error is overruled as moot.

VIII.    Conclusion

{¶ 53} Having sustained Hodge's first and fifth assignments of error, his convictions are reversed, and this cause is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . .

WELBAUM, J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Charles M. Blue
Hon. Mary E. Montgomery